[Crim. No. 15921. Second Dist., Div. Two. Dec. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
TERESA JO ANN BLAKESLEE, Defendant and Appellant.

## COUNSEL

Gerald T. Manpearl, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ivan Hoffman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FLEMING, J.**—On the evening of 9 November 1967, Mary Jane Blakeslee was killed in her apartment in Canoga Park, Los Angeles, by five gunshot wounds, four in the head and one in the back. Two children lived with her in the apartment—her daughter, Teresa Blakeslee, age 18, and her son, Michael Blakeslee, age 16. Earlier in the year Teresa had moved out of the apartment for a few months, but she had later returned home. Michael had spent a year with the California Youth Authority.

On the evening of the slaying Michael had an argument with his mother over his drinking and driving, and his mother threatened to take away his car. Michael then left the apartment about 7:20 p.m., and Teresa accompanied him to the carport area behind the apartment house in order to

hear his new stereo tape. When they left the apartment their mother was alone reading, and the apartment door was unlocked. After listening for a few minutes to the stereo tape Michael drove away in his car, and Teresa started back toward the apartment. The time was about 7:25.

Jule Ledbetter and his wife returned to the apartment house from dinner about 7:30 and parked their car in their assigned parking area directly below the Blakeslee apartment. Mr. Ledbetter heard a woman's voice from that apartment say, "What is going on here? Oh, my God." Then he heard a noise which he described as a pow. He told his wife to listen, and Mrs. Ledbetter then heard a noise which sounded to her like a pan hitting the floor. Seven or eight seconds later she heard the same noise again. Thereafter the Ledbetters went to visit friends in another apartment in the building.

Marshall Loney, age 16, who lived with his parents in the apartment house, left his apartment about 7:35 to get a coke at a nearby store. As he walked across the courtyard, he saw Teresa outside the door of her apartment carrying a stack of newspapers in her hands. After greeting each other they both walked through the gate leading from the courtyard to the trash-can area, where Teresa deposited her newspapers in one of the trash cans. Marshall continued on to the store, and Teresa went back into the courtyard. After Marshall got his coke, he returned to the apartment house about 7:40. As he entered the courtyard he saw Teresa standing by the gate, and the two again exchanged greetings. Marshall then went to the carport area behind the apartment house and sat in his family's car about 15 minutes, drinking his coke and listening to the car radio. He saw Mrs. Blakeslee's car in the carport, but he did not see Teresa go near it.

About 7:35 or 7:40 Teresa knocked on the door of Mrs. Joanna Bryant, a medical technician, and asked her to come quickly because her mother had been hurt. Mrs. Bryant accompanied Teresa to the Blakeslee apartment and found Mrs. Blakeslee lying on the floor, apparently dead. Teresa said she had telephoned for help, but Mrs. Bryant called for the police and an ambulance.

About 7:50 Mr. Ledbetter came down to the pool area of the apartment house, saw Teresa walk over to the pool, and heard her say, "She's dead." When a police officer asked if anyone had heard anything, Mr. Ledbetter told him about the statement and the noise he had heard earlier from the Blakeslee apartment. Teresa, who was sitting nearby, turned around and said, "I didn't say that." Mr. Ledbetter replied, "Lady, I didn't say you said that. I said I heard that."

Police Officer William Cleary found Mrs. Blakeslee's body lying on its back in the entrance to a bedroom. The apartment was orderly, and the

lights and television set were on. He searched for a weapon and cartridges inside and outside, including the trash cans, but found nothing.

About 8 o'clock Michael arrived back at the apartment house, having been driven there by a friend from the gas station where he worked. He did not go in the apartment that night, but next day he went inside with the police and discovered that his single-shot, .22 caliber rifle was missing from its place in his bedroom. In a cabinet above the rifle he kept a supply of .22 caliber hollow-point ammunition, a type whose bullets shatter on impact. Each time the rifle was fired it had to be reloaded, a process which took some seconds between shots.

At 11:30 on the night of the slaying Police Officer Louis Netza advised Teresa of her constitutional rights and then started to question her. Teresa said she did not shoot her mother and did not know who did. After her brother drove away in his car she asked her mother if she could drive her mother's car, and her mother said yes. She and her mother carried newspapers out to the trash can at 7:35, and Teresa then left for a drive which, as she described it, covered 11 miles. On her return home she parked her mother's car in the carport, walked into the apartment courtyard, and there saw Marshall Loney. She went to her apartment door and then turned back to look for Marshall, whom she found near the trash cans. The two spoke about school. She then went back to her apartment, and on entering it she discovered her mother's body. She called for an ambulance. Teresa told Officer Netza she had never seen a rifle in the apartment and did not know her brother owned one.

On 18 December Teresa Blakeslee was charged with the murder of her mother, Mary Jane Blakeslee.

At the trial the coroner testified that the bullets which killed Mrs. Blakeslee had shattered on impact and could not be used to identify the gun from which they had been fired. However, he expressed an opinion that the wounds in the body were consistent with those which would have been made by .22 caliber rifle bullets.

Michael testified that between 7:30 and 7:45 he had been en route from a friend's house to the filling station where he worked, and at the station he had been told that something happened at home. He said Teresa knew how to operate his rifle and had used it on several occasions for target practice. She also knew where he kept the ammunition. According to Michael, Teresa and his mother did not get along well. His mother had a gentleman friend, Adrian Lizotte, and for some years the two had considered marriage. Whenever the subject of his mother's possible marriage to Mr. Lizotte arose, Teresa would become angry and violent. A few years earlier she had called the police to complain about the relationship between her mother and Mr. Lizotte.

Teresa took the witness stand and denied that she had killed her mother. On the night of the crime her mother had given her the keys to the car and told her to leave because someone was coming to discuss business. Teresa took the car and drove one block to Zody's restaurant, stayed there a few minutes, drove back alongside the apartment house to see who was visiting her mother, saw no one, went back to Zody's, sat there for a while listening to the radio, and then returned home about 7:35 or 7:40. She saw Marshall Loney by the pool and spoke to him about his grades. She then went to her apartment and discovered her mother's body about 7:40.

Teresa admitted she had known there was a rifle in Michael's room and had lied to Officer Netza about not knowing it. She also admitted lying to him about the route she had driven her mother's car that night. (The prosecution had produced evidence that on the night of the crime the car could not have been driven more than four miles.) Teresa said her motive for lying about the route she had driven that night was to protect her brother Michael. When asked how the story of a false route would protect her brother she said, "Well, it got rid of the rifle." Teresa admitted she and her mother had not gotten along in the past, but she said they had gotten along well during the six months prior to the crime. She had written the administrators of a trust fund set up by her father that she did not want her mother to receive benefits from the fund, and two years before the crime she and her mother had gone to a doctor four times to seek help on family problems.

This summarizes the principal evidence in the case. No weapon was ever produced or specifically identified with the slaying.

On this evidence Teresa Blakeslee was found guilty of second-degree murder. On appeal she argues the insufficiency of the evidence to establish her guilt, the use of incomplete instructions on manslaughter, and the use of misleading instructions on murder.

*Insufficiency of the Evidence*

■ The main question on appeal is whether there is sufficient evidence to support a conviction for murder. ■ The rule on sufficiency of evidence has been recently summarized by the Supreme Court in *People* v. *Redmond,* 71 Cal.2d 745, at p. 755 [79 Cal.Rptr. 529, 457 P.2d 321]: "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. (*People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

■ "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].) ■ Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. (*People* v. *Briggs,* 255 Cal.App.2d 497, 500-501 [63 Cal.Rptr. 111]; *People* v. *Tatge,* 219 Cal.App.2d 430, 435-436 [33 Cal.Rptr. 323]; *People* v. *Rascon,* 128 Cal.App.2d 118, 122 [274 P.2d 899].)

"In *People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777], we recently pointed out that, in considering the sufficiency of evidence purporting to connect the defendant with the crime, 'the appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. (*People* v. *Hall* (1964) *supra,* 62 Cal.2d 104, 109-110 [41 Cal.Rptr. 284, 396 P.2d 700], citing *People* v. *Huizenga,* (1950) 34 Cal.2d 669, 676 [213 P.2d 710].) ■ The prosecution's burden is a heavy one: "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." (*People* v. *Hall, supra,* at p. 112.) Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' "

■ Thus on appeal the test of the sufficiency of the evidence is whether proof of guilt is substantial, is of solid value, and reasonably inspires confidence. We think it follows that the more serious the charge—and murder is considered the most serious charge of all—the more substantial the proof of guilt should be in order to reasonably inspire confidence. With this legal standard in mind, we proceed to an analysis of the proof.

■ Our starting point puts defendant at the scene of the crime. She lived in the same apartment with the victim and had been at home during the evening of the crime. Credible evidence fixed the time of the killing at 7:30. Defendant admitted, and her brother testified, that she had been in the apartment until 7:20 or 7:25, and it was established that she was in the apartment at 7:40, at which time, according to her testimony, she discovered the body. During the relatively brief interval between these times she was seen twice in the courtyard outside her apartment by Marshall Loney, once about 7:35 and again about 7:40. Thus the evidence places defendant at the scene of the crime about five to ten minutes before, and

about five to ten minutes after, the commission of the crime. Nevertheless, these facts alone do not directly support an inference that she committed the crime. At most they show opportunity. No one witnessed the shooting, no one placed defendant in the apartment at the time of the shooting, no one saw defendant with a weapon, and no one identified defendant with any particular weapon.

On motive, evidence was introduced that defendant had quarrelled on occasion with her mother about her mother's possible remarriage, had complained to the police about her mother's gentleman friend, had objected to her mother's use of moneys from a family trust fund, and had temporarily moved out of the family apartment for a few months. None of this evidence bore directly on the relationship between mother and daughter on the night of the crime. While there had been a family quarrel that night, the quarrel had been one between Mrs. Blakeslee and Michael, and in that quarrel Teresa played no part.

The most damaging inference against defendant arose from the account of her movements she gave the police on the night of the crime, an account she later admitted was false. In that account she said she had left the apartment at 7:25 and taken an 11-mile drive. She also claimed she had never seen a rifle in the apartment and did not know her brother owned a rifle. At the trial Teresa testified she had driven only one block to a nearby restaurant and stayed there a short time, and she admitted she had known there was a rifle in Michael's room. When asked her motive for lying on the night of the slaying she said she had done it to protect her brother Michael.

The only other evidence against defendant arose from a remark she made while Mr. Ledbetter was telling the police what he had overheard at the time of the shooting. After Mr. Ledbetter said he heard a woman's voice say, "What is going on here? Oh, my God," defendant said, "I didn't say that." In the present state of the record we find it impossible to attach any great significance to this remark. Without any indication of the inflection or emphasis used in the denial it is impossible to tell from the words whether defendant was denying that she made the statement ("*I* didn't say that," which would be exculpatory) or whether defendant was denying that she made that particular statement ("I didn't say *that*," which as an implied admission of presence at the scene of the crime would be inculpatory).

These items represent the totality of the proof of the murder introduced against defendant. What do they add up to?

First, defendant was at the scene of the crime around the time of the crime and had an opportunity to commit it.

Second, there had been past friction between decedent and defendant, which suggested a possible motive for the crime. No evidence was produced of any current quarrel between mother and daughter, or of any physical violence ever having taken place between the two. The record of former quarrels and disputes between mother and daughter does not seem to us exceptional or extraordinary. Rather it appears to be one which could be duplicated in thousands of other households, and which may merely reflect routine stresses which frequently arise between a widow holding a fulltime job and her teenage daughter.

Third, defendant on the night of the crime had given the police a false account of her movements and had denied knowledge of her brother's rifle. These falsehoods may form the basis for unfavorable inferences against her. (Witkin, Cal. Evidence (2d ed. 1966) § 512.) But inferences of what? The refutation of these falsehoods did not directly implicate defendant in the slaying. Rather their refutation merely destroyed defendant's asserted alibi for the time of the crime and rebutted her claimed ignorance of an accessible weapon which could have been used to commit the crime. This negation of a negative (she was not there) does not amount to affirmation of a positive (she did the shooting). Inferences drawn from her tender of a false alibi do not directly support a murder accusation against the defendant. ■ While it is said that a false alibi tends to establish a consciousness of guilt (*People* v. *Osslo,* 50 Cal.2d 75, 93 [323 P.2d 397]), the logical force of this deduction is weakened when there is some plausibility to the defendant's subsequent explanation of the reason for the falsehood. ■ Here, defendant's explanation was that in giving these falsehoods she was trying to protect her brother Michael.

In evaluating the significance of this evidence under the test outlined in *People* v. *Redmond,* 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321], we ask ourselves whether it is sufficient to have persuaded the trier of fact of the defendant's guilt of murder to a near certainty and beyond a reasonable doubt. Is it solid, substantial, and does it reasonably inspire confidence in defendant's guilt? One factor relevant to these questions is the absence of evidence we would normally expect to find in a murder prosecution based on circumstantial evidence. The absence of evidence, like Sherlock Holmes' curious incident of the dog in the nighttime which did not bark, may have as great an impact on the substantiality of a case as any which is produced, for the absence of evidence which would normally be forthcoming can undermine the solidity of the proof relied on to support a finding of guilt. (*People* v. *Hall,* 62 Cal.2d 104, 111 [41 Cal.Rptr. 284, 396 P.2d 700].)

At bench, the missing evidence is not peripheral but is central to the

charge of murder. It consists of (1) evidence of a murder weapon, which we do not have; (2) evidence linking the bullets which caused the victim's death to a particular weapon, which we do not have; (3) in the absence of the first two items, evidence of the type or caliber of weapon used for the murder, which we do not have; (4) evidence to establish a connection between a murder weapon and the defendant, either tangible evidence such as fingerprints, palm prints, or powder burns, or testimonial evidence linking the defendant in some manner to a weapon, which evidence we do not have.

Merely to illustrate the insubstantiality of the case against Teresa and not to suggest any implication of wrongdoing or suspicion of guilt against another, on the evidence before the court we could draw an almost equally plausible series of inferences to build a case of murder against defendant's brother Michael. He had been in the house that night; he had quarreled with his mother, who had threatened to take away his car; presumably his rifle and his ammunition were used to kill his mother; when Teresa left the apartment he had the opportunity to return to it, get his rifle, kill his mother, then leave, dispose of the rifle, and return home by 8 p.m. He had spent a year in the custody of the California Youth Authority. When Teresa discovered the body of her mother she lied to protect her brother, either because she knew he had committed the crime or because she believed he had committed the crime. On the evidence in this record we could thus bring together opportunity, motive, propensity, and even work in Teresa's falsehoods, in a plausible reconstruction of the crime with Michael as protagonist instead of Teresa.

When evidence is susceptible to such manipulation we think it lacks substantial probative value and justifies comments similar to those made by the court in reversing a murder conviction in *People* v. *Hall,* 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700]: "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence. This case presents a mass of undisputed evidence and unexplained facts that destroys confidence in any inference pointing to guilt. Each item of evidence against defendant is so weak and inconclusive that together they are insufficient to constitute proof beyond a reasonable doubt."

Here, on the formal record of the case we have a conviction for murder based on defendant's presence at the scene of the crime five to ten minutes before and five to ten minutes after the crime, and on the fact that she told a false story to the police about her movements that night. This evidence does not reasonably inspire confidence in defendant's guilt, and we think it insufficient to constitute proof beyond a reasonable doubt.

*The Instructions Regarding Manslaughter and Felony-Murder*

█ Defendant has urged two errors in the jury instructions, which may be briefly disposed of.

Error was charged because the trial court failed to instruct the jury on the defense of diminished capacity and the relation of this defense to the crime of manslaughter. No such instruction was requested by either party. Defendant did not urge manslaughter as an alternative defense theory, either because of diminished capacity or because of killing in the heat of passion, nor did defendant introduce any evidence to suggest that she suffered from diminished capacity. The basic defense remained one of alibi. Hence an instruction on diminished capacity was not required. (*People* v. *Conley,* 64 Cal.2d 310, 319, 325 [49 Cal.Rptr. 815, 411 P.2d 911].)

The trial court gave the instructions on second degree felony murder disapproved in *People* v. *Ireland,* 70 Cal.2d 522, 538-539 [75 Cal.Rptr. 188, 450 P.2d 580]. However, in this case, unlike *Ireland* and similar cases, the commission by defendant of an assault with a deadly weapon was not conceded, and hence the jury did not run the risk of mistaking proof of the assault with a deadly weapon for proof of the malice necessary to constitute murder. Hence the giving of the instruction was nonprejudicial. (*People* v. *Fain,* 70 Cal.2d 588, 597 [75 Cal.Rptr. 633, 451 P.2d 65].)

The judgment is reversed.

Roth, P. J., and Wright, J., concurred.