*702
 
 Opinion
 

 RAYE, J.
 

 This is an appeal of a second degree murder conviction based solely on circumstantial evidence. On May 17, 1991, Fritz Bieth was severely beaten and shot to death. Apparently new and unused dildos, “x-rated” publications, a container of body oil, ajar of petroleum jelly, lingerie, and a G-string were found with his body inside his van which was parked next to a motel well known for prostitution, homosexual activity, and drug trafficking. The prosecution charged the victim’s business partner, Arvind Daya, with murder motivated by personal animosity and financial gain. Rejecting his alibi defense, the jury convicted Daya of murder in the second degree. Defendant appeals.
 

 In his 162-page opening brief, defendant alleges the conviction must be reversed based on any one of the trial court’s errors involving 15 issues. We have consolidated the needlessly long and confusing dissection of the issues into three inquiries: (1) Is the evidence sufficient to support the verdict?; (2) Did the court commit reversible error by admitting or excluding evidence?; and (3) Did reversible error infect the jury’s deliberative process? We begin where the defendant ends his analysis by reviewing the sufficiency of the evidence.
 

 I
 

 Is the evidence sufficient to support the verdict?
 

 The scope of appellate review of the sufficiency of the evidence has been clearly and consistently articulated. “An appellate court called upon to review the sufficiency of the evidence supporting a judgment of conviction of a criminal offense must, after a review of the whole record, determine whether the evidence is such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.] The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence. [Citation.] Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant’s guilt beyond a reasonable doubt. ‘“If the circumstances reasonably justify the trier of fact’s findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.” ’ [Citations.] ‘Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.’ [Citation.]”
 
 (People
 
 v.
 
 Bean
 
 (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996].)
 

 
 *703
 
 We summarize the evidence to satisfy twin objectives: to fairly represent the
 
 whole
 
 record, yet with requisite deference to the jury’s findings. The task is tedious because, as the Attorney General points out, the prosecution relied on an intricate web of circumstantial evidence.
 

 Motive
 

 Before meeting the defendant, the victim owned a company, Floratech, in Sacramento, and had developed and patented a successful method of raising orchids. Utilizing the victim’s secret process, the orchids became marketable in one-half the time and had a far greater survival rate than industry standards. The victim’s parents helped with the daily operation of the business and his mother, Helen Bieth, knew the secret process her son had developed.
 

 The defendant and Pravin “Pete” Baloo owned a ranch in Chico. In 1989 the victim, the defendant, and Baloo formed a partnership to jointly operate Floratech. The defendant and Baloo each purchased a third of the business for an initial investment of $70,000. The victim agreed to move the business to the Chico acreage and the defendant and Baloo agreed to convey a one-third interest in the ranch to the victim. Floratech began to prosper and by the spring of 1991 the profit projection was very good and the orchid crop was worth $10 to $13 million. Defendant did not work in the greenhouses, but was involved in the financial decisions and accounting.
 

 Despite Floratech’s growth, the defendant and the victim became disenchanted with the partnership. Three witnesses testified to the acrimonious relationship between the two. Sunday Eiselt worked as the victim’s personal secretary at Floratech from June 1990 to March 1991. She recounted several heated arguments, none involving physical violence. They often fought over the victim’s personal use of corporate credit cards, his failure to keep proper accounting records, his undisclosed bankruptcy, and his frequent and increasing absences. Defendant was angry when he discovered Floratech was paying the premiums on insurance policies designating the victim’s parents and former partners as beneficiaries. In December 1991 defendant angrily refused the victim’s request for a raise complaining he had already invested $200,000, $130,000 more than his original commitment. Eiselt quit in March 1991 because “[t]he situation at Floratech had escalated to the point where I was very stressed out every day and I wanted out of that situation.” During a visit the following month, defendant told Eiselt “he was very tired of everything out at Floratech. Fritz was still gone a lot, but he was very hopeful about his new venture.”
 

 Betty Light, the victim’s fiancée, testified he had become “troubled and depressed” and questioned his selection of business partners. Following a
 
 *704
 
 meeting with defendant and Baloo, the victim told Light, “They keep telling me this is a loan, this isn’t a partnership and that I owe them all this money back plus interest.”
 

 Debra Clevenger, a close friend of defendant, testified that defendant was disgruntled as well. Defendant continually complained the victim spent too much money and not enough time at Floratech.
 

 The victim went fishing from May 14 through May 16 with Craig Chavez, a close friend for over 25 years. Chavez testified the victim told him he wished he had never gone into business with defendant and Baloo. Neither partner, complained the victim, was pulling his weight. The victim told Chavez he was going to confront defendant as soon as he returned home. Stating, “I have shit on A.D. [defendant],” the victim threatened to expose defendant, if he did not capitulate.
 

 Following the murder, defendant told the victim’s brother that “a million dollars was coming in.” When asked initially by an investigating police officer whether there was an insurance policy on the victim’s life, however, defendant avoided the question and did not answer. When asked about the existence of a policy a second time, defendant responded he did not know. After the officer informed defendant he could easily check, defendant said he thought there was a $500,000 to $1 million policy payable to the “corporation.”
 

 At the time of his death, the victim had a $1 million life insurance policy naming defendant and Baloo as beneficiaries. He also had a second policy providing $50,000 to his parents and $200,000 to Floratech as beneficiaries. The partners had negotiated a buy-sell agreement. Although apparently the partners orally agreed the insurance was to fund a buy-out, the parties never executed a written agreement. The victim’s insurance agent testified, if there was no buy-sell agreement, each of the surviving partners would receive $500,000.
 

 May 17: The Chronology
 

 The Victim
 

 The victim’s father testified he observed the victim and defendant engaged in a “very serious” conversation at 9:15 a.m. at the Floratech ranch. When he returned 45 minutes later, defendant “just stared right into [the victim’s] eyes with a very, very, very mean, ugly look.” As the victim continued his paperwork, defendant stared into his face.
 

 
 *705
 
 The victim met with Sharlene Hanaway, a licensed therapist, alone from 11 a.m. to noon, and together with Light, from noon to 1 p.m. Hanaway testified the victim had difficulty understanding simple concepts and spoke in a flat monotone. The victim told Hanaway that although he had a $300-$400 a week cocaine habit in college, he had quit on his own. Hanaway testified the victim exhibited symptoms of mild depression and concluded he had either neurological problems or remained engaged in substance abuse. His inability to understand or to track people in their conversations was consistent with drug induced brain cell damage. The victim complained of acute financial problems coupled with his relational problems with his fiancée Light. When Light complained, however, about the victim’s workload and that he was carrying the weight of the business, he became defensive of his partners. He expressed no anger or animosity toward defendant or Baloo.
 

 The victim’s parents testified he was at the Floratech ranch from 2 to 3 or 3:30 p.m. He told his mother he had a meeting with Baloo and told his father he would be back in an hour to an hour and one half.
 

 Baloo testified he drank beer with the victim at Baloo’s house. The victim left around 4:30 or 5 p.m. saying he had another appointment.
 

 Defendant and Baloo owned a vacant restaurant in Chico. The victim, defendant, and Baloo used the restaurant as a meeting place. Before the victim left on his fishing trip, Baloo gave him a key to the restaurant. The victim had tentatively scheduled a 5 p.m. appointment at the restaurant with Sandy Norris, a caterer, who was interested in purchasing equipment or leasing the restaurant. At 5:45 p.m. the victim left a message on Norris’s answering machine stating he was on the way to the restaurant.
 

 At 8:18 p.m. officers from the Marysville Police Department found the victim motionless in his van parked next to the Lantern Inn. He lay beneath a blanket with blood on his head, face, and hands wearing a shirt, jockey shorts, and black socks. Amongst a variety of new and unused sexual aids was a black lace G-string near his hands and a large dildo in his left hand. His face and head had been severely beaten and he was shot in the chest and back. His blood-alcohol content was .29 percent.
 

 The Defendant’s Alibi
 

 The defendant’s friend, Debra Clevenger, testified the defendant arrived at her apartment between 11 a.m. and noon, and left between 1 and 2 p.m. He told her he was going back to the ranch to meet with the victim.
 

 
 *706
 
 The defendant’s wife testified the defendant came home for lunch about 1 p.m. and did paper work until 2:45 p.m.
 

 Victor Morales testified he saw defendant talking to Benjamin and Pompilio Ortiz at the Ortiz ranch in Chico from 1 until 1:20 p.m.
 

 About 4 p.m. defendant stopped by Glenda and Michael Wiles’s house ostensibly to collect a yearly interest payment they owed on a loan. The Wileses were former employees of the police department. Glenda testified it was odd defendant had just stopped by, and he left at approximately 5:10 p.m.
 

 Defendant’s daughter testified defendant arrived home between 5:15 and 5:30 p.m. She left with her brother at 5:45 p.m. and returned at 6 p.m. His wife returned between 8 and 9 p.m. Defendant left the house for approximately 15 minutes to pick up his son and then returned home. Tliey all watched an Indian movie together until 11:30 p.m.
 

 The Ortiz Connection
 

 In 1986 defendant and Baloo sold Clevenger some ranch property in Chico. Eleven months later, Benjamin Ortiz and his brother, Pompilio, and Guillermo Hidalgo purchased the property (the Ortiz ranch).
 

 Benjamin’s cousin, Victor Morales, lived with Benjamin in a mobilehome on the ranch. He testified Benjamin and Pompilio left the ranch around 1:30 or 2 p.m. on May 17, shortly after meeting with the defendant. Morales was enrolled in an English class with Benjamin and Pompilio on Friday nights from 6 to 9 p.m. Neither Benjamin nor Pompilio returned to the ranch before class nor did they attend class that night. Morales did not see Benjamin until 9 p.m.
 

 Carrie Tindol, a former maid at the Lantern Inn, positively identified Benjamin as the driver of the van in which the victim’s body was found. She also testified she had seen Benjamin at the Inn regularly and had seen the defendant at least once at the Inn.
 

 Close friends of the victim, Vicky and Les Witt, were at the Floratech ranch when Benjamin arrived with Morales at noon on May 18. Mr. Witt told Ortiz about the murder but Benjamin exhibited no reaction. Defendant and Benjamin walked off toward the greenhouse for about 15 minutes. The victim’s mother testified she and her husband knew Benjamin well and he customarily greeted them when he came to the ranch. That day, however, he
 
 *707
 
 parked his truck out by the gate and never approached the family nor extended any offer of consolation.
 

 A week later, Morales gave Benjamin a police officer’s card the officer gave him at a party held in the victim’s honor at the ranch. Morales testified he has not seen Benjamin since he gave him the card. Pompilio testified he saw his brother in Mexico in December 1991.
 

 Defendant’s Postmurder Conduct
 

 1. The Midnight Cleanup: About midnight on May 17/18, Merrilee Anzalone noticed lights on in defendant’s vacant restaurant and two trucks parked alongside the restaurant. She thought it was odd since the restaurant was vacant. She testified one of the trucks was a mini-pickup with a shell and the other truck was larger. Defendant owned a brown Dodge Ram mini-pickup with a camper shell. Anzalone acknowledged the similarity between the trucks.
 

 2. The Wine Coverup: Baloo testified under a grant of immunity from prosecution. On Sunday, May 19, defendant called Baloo to accompany him to the Floratech ranch. Defendant drove. He took a slightly indirect route and, from a bridge, he looked down at their restaurant and noticed a side door of the restaurant was open. They decided to investigate. Baloo noticed the front tile floor entrance was clean whereas the rest of the restaurant was dusty and dirty. Defendant, pointing to a planter, remarked, “Look, that looks like blood.” Although Baloo thought the marks looked like brown paint and suggested they call the police, defendant resisted, contending they would be blamed if anything happened because they were Indians. He told Baloo they should spill wine in the restaurant to make it look like transients had broken into the restaurant.
 

 Defendant and Baloo bought five gallons of wine at a local Safeway. The Safeway clerk corroborated Baloo’s testimony. He remembered two dark complexioned men of Mexican or Indian descent purchasing five gallons of Mountain Castle Wine on Sunday morning, May 19. Defendant and Baloo broke the bottles of wine on the tile floor of the restaurant. They borrowed brooms from the owner of a Texaco station adjacent to the restaurant. The owner asked why one of the men looked stunned and defendant answered, “[H]is father had died.”
 

 Defendant coached Baloo’s response to police inquiries. He told Baloo to tell the police they found the wine and broken bottles at the restaurant and cleaned up the broken glass and wine. Baloo initially lied to the police as defendant directed.
 

 
 *708
 
 3. Soliciting Pearsall: Defendant employed Michael Pearsall to do occasional landscaping work for him. On May 23 he asked Pearsall to do him a favor. Characterizing the victim as “a no good son-of-a-bitch and a faggot,” defendant promised to pay Pearsall $5,000, co-sign on a loan for a Chevrolet Blazer, and give him planting containers and weight equipment if Pearsall would make an anonymous call to network television and in a muffled voice say, “I’m the one that murdered Fritz Bieth . . . and I have the handgun. You’ll never find it, and it was over a bad deal of cocaine, a kilo of cocaine, and that’s why I shot him because he burned me and besides he was a no good son-of-a-bitch and faggot.” Defendant insisted Pearsall rehearse the call three times.
 

 Instead of making the call from a public telephone as promised, Pearsall went to the Chico police. He was equipped with a wireless transmitter before meeting with defendant. When Pearsall reported to defendant he had made the call and repeated what he had said, defendant replied, “That’s good. You did good.” Referring to the victim, defendant said he was “better off dead” and he was “just a faggot anyway.” Pearsall asked him what really happened. Defendant replied that there had been a scuffle at the restaurant. Defendant indicated he and Baloo were present and “it was just a big mess.” He denied killing the victim, indicating that the man who murdered the victim was “a man who had a red Firebird and was back in Ohio.”
 

 Defendant had a number of conversations with friends and family following the murder. He told Eiselt that “three things cause murder, love, drugs and money, and currently he felt that the police were suspecting he and Mr. Baloo of the money aspect, and that he needed my help in remembering some dates as far as the life insurance with the three partners.” Defendant then asked her if she remembered he resisted Fritz’s idea to purchase “key man” life insurance and when she told him she did not remember that, he pleaded, “You have got to help me.” On the day she was to be interrogated by the police, defendant called and asked what she was going to say. Eiselt testified she was intimidated.
 

 Defendant’s attack on the sufficiency of the evidence is fatally flawed. Rather than surveying the whole record, as we are compelled to do, he dissects the prosecution’s case and argues the individual pieces are insufficient to support the conviction. For example, he complains “motive alone is insufficient to establish identity”; “motive and opportunity alone are insufficient”; “opportunity alone is insufficient to support a conviction”; “mere presence at the crime scene was insufficient,” and “suspicion alone is insufficient.” In a case built solely on circumstantial evidence, none of the individual pieces of evidence “alone” is sufficient to convict. The sufficiency of the individual components, however, is not the test on appeal.
 
 *709
 
 Rather, in reviewing an attack on the sufficiency of the evidence, we need only determine whether a reasonable trier of fact, considering the circumstantial evidence cumulatively, could have found the defendant guilty of second degree murder beyond a reasonable doubt.
 

 From the evidence presented to the jury, we distill evidence of motive, opportunity, and consciousness of guilt. There was evidence defendant’s and the victim’s relationship had deteriorated and was increasingly hostile. Both complained openly about their disappointed expectations in the partnership. While the victim’s absences from the business continued to increase, his accountability decreased to defendant’s escalating annoyance. Moreover, the day before the murder, the victim communicated his plan to confront the defendant. On the morning of the day the victim was murdered, his father observed an unfriendly meeting at least, and perhaps an angry confrontation, between the two.
 

 Not only was the jury presented with evidence the defendant was motivated to rid himself of an unproductive and irresponsible partner, but there was also evidence the defendant had learned the secret process and was planning to operate another orchid business on the east coast. The jury could reasonably conclude the insurance proceeds were not committed to fund a buy-out since an agreement was never executed and defendant’s $500,000 share would subsidize his new venture. The victim’s elimination, therefore, would enable defendant to perpetuate Floratech without the victim as an encumbrance and to raise the needed capital to finance his new business. The jury was free to reject defendant’s argument the nonviolent history of their disagreements and the existence of an oral agreement to use the insurance proceeds to purchase Floratech disproved the prosecution’s circumstantial evidence of motive. While the evidence may not have been overwhelming, it was sufficient to sustain an inference of motive.
 

 There was also evidence to suggest that the defendant or Benjamin Ortiz killed the victim on May 17 between 5:45 and 8 p.m. at the defendant’s vacant restaurant and moved the body to the Lantern Inn in Marysville. There was evidence they were both familiar with the Lantern Inn. Carrie Tindol, a maid, testified she had seen them at the Inn before the murder and positively identified Benjamin as the driver of the van on the night of the murder. We address the reliability of the identification procedures in the next section. Suffice it to say, Tindol was vigorously cross-examined by the defense and the jury was entitled to ascribe the weight the testimony deserved.
 

 Again rearguing the inferences to be drawn from the evidence, defendant insists there was insufficient evidence he aided and abetted Benjamin or
 
 *710
 
 solicited his help in the killing. Yet the jury heard the testimony the defendant met with Benjamin a few hours before the murder and on the morning following the murder. The jury was also informed the defendant had a preexisting relationship with Benjamin. Benjamin had not only worked as an employee of Floratech but had also purchased the ranch defendant ostensibly sold to his friend Clevenger who then sold it to Benjamin. The sale to Benjamin had been previously arranged by the defendant.
 

 Most damaging is the consciousness of guilt evidence. Benjamin failed to react when he purportedly learned of the victim’s death and uncharacteristically ignored the victim’s parents whom he knew and usually greeted. Then, upon learning of a potential interrogation, he simply absconded.
 

 The defendant’s conduct was more blatantly incriminatory. According to Baloo, the defendant concocted the wine coverup and lied to family, friends, and the police that transients had broken into the restaurant, spilling wine and breaking bottles and that he and Baloo had simply cleaned up the mess. The jury could draw the eminently reasonable inference the defendant bought and spilled the wine to eliminate any evidence of blood or fingerprints from the scene of the crime.
 

 Beyond planting stories about the victim’s homosexual propensities and substance abuse, the jury could infer the defendant panicked in soliciting Michael Pearsall to divert the murder investigation by calling the media and posing as the victim’s murderer. Regardless of Pearsall’s credibility, and the prosecution conceded he was a terrible witness, the jury heard the taped conversation between Pearsall and defendant including defendant’s admission of complicity.
 

 Finally, defendant’s responses and reactions during the investigation were equally suspicious. He was evasive when asked about the existence of a life insurance policy on the victim’s life, until informed the information was easily discoverable. Moreover, he was the first to point to blood spots on a planter wall before anyone mentioned there was blood in the restaurant.
 

 Relying heavily on
 
 People
 
 v.
 
 Blakeslee
 
 (1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839], defendant insists the prosecution’s case relied exclusively on speculation, conjecture, and impermissible inferences. Accordingly, defendant urges us to adopt Blakeslee’s conclusion: “This case presents a mass of undisputed evidence and unexplained facts that destroys confidence in any inference pointing to guilt. Each item of evidence against defendant is so weak and inconclusive that together they are insufficient to constitute proof beyond a reasonable doubt.”
 
 (Id.
 
 at p. 840.) Defendant points out the
 
 *711
 
 abundance of facts that were not proved: his presence at the scene of the crime, a murder weapon, an actual, rather than possible, motive, identification of the perpetrator, and solicitation of Benjamin Ortiz. The
 
 Blakeslee
 
 court ultimately rejected the accumulation of negative evidence as an affirmation of the facts not proven.
 

 Blakeslee
 
 was aptly distinguished by the Supreme Court in the more recent case,
 
 People
 
 v.
 
 Thomas
 
 (1992) 2 Cal.4th 489 [7 Cal.Rptr.2d 199, 828 P.2d 101]. “In
 
 Blakeslee,
 
 proof of guilt consisted principally of evidence of opportunity and motive, together with a false alibi indicating consciousness of guilt. The court reversed Teresa Blakeslee’s conviction because the evidence was insubstantial in light of what was
 
 not
 
 proven, principally the prosecution’s failure to produce the murder weapon or link a specific weapon with the crime, and because the evidence could plausibly be interpreted as consistent with the guilt of defendant’s brother. The
 
 Blakeslee
 
 court discounted the false alibi as evidence of consciousness of guilt, finding it to be of less than solid value because the defendant plausibly explained why she lied (i.e., she wanted to protect her brother). ... In contrast, the many inconsistencies in defendant’s statements [in
 
 Thomas]
 
 are not so easily resolved. No plausible explanation for them appears, apart from defendant’s wish to shift suspicion away from himself. Comparison of the evidence in this case with that in
 
 Blakeslee,
 
 for whatever such a comparison is worth, thus fails to reveal any deficiency of proof warranting reversal.”
 
 (People
 
 v.
 
 Thomas, supra,
 
 2 Cal.4th at p. 516.)
 

 Similarly, in this case the deficiency is not in the evidence of culpability but rather the deficiency of any plausible explanation for the abundance of evidence pointing to the defendant’s postmurder consciousness of guilt. Unlike Ms. Blakeslee who fabricated an alibi to protect her brother, there was no exculpatory evidence as to why the defendant staged the wine coverup or enlisted Pearsall to claim he was the victim’s murderer. We conclude, as the court did in
 
 Thomas,
 
 the evidence is sufficient to sustain the conviction.
 

 The defendant maintains consciousness of guilt evidenced by his post-murder conduct applies equally to involvement as an accessory after the fact. His trial strategy was predicated on that precise theory. He successfully urged the court to instruct the jury on accessory after the fact, although he persuaded the court not to provide a verdict form to coincide with the instruction. He argued vociferously the prosecution had not met its burden of proving beyond a reasonable doubt defendant murdered the victim and, while never conceding he was an accessory, defendant maintained the evidence at most proved his complicity after the killing. Consequently the
 
 *712
 
 jury heard and rejected the identical argument defendant raises on appeal. It was the jury’s prerogative, not ours, to assess the credibility of the witnesses and the inferences to be drawn from the consciousness of guilt evidence. Based on the limited scope of appellate review, we cannot say the cumulative evidence was insufficient to sustain the jury’s finding the defendant was guilty of second degree murder.
 

 II
 
 *
 

 III
 

 Did error infect the deliberative
 
 process?
 

 A.
 
 The Instructions
 

 Defendant alleges a host of instructional errors. He complains the court erred by instructing the jury sua sponte on the lesser included offense of second degree murder and by failing to instruct sua sponte on the subtleties of motive, opportunity, and solicitation. His allegations are without merit.
 

 Defendant tenaciously pursued his all-or-nothing strategy. He objected to any instructions on the lesser included offenses of first degree murder and attempted to obtain an acquittal by raising a reasonable doubt he committed the greater offense. The right to pursue such a strategy was discredited years ago.
 

 “The trial court functions both as a neutral arbiter between two contesting parties and as the jury’s guide to the law. This role requires that the court fully instruct the jury on the law applicable to each particular case. ' “It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to tire issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury’s understanding of the case.” [Citations.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present. . . .’ [1] The fulfillment of this obligation ensures that the jury will consider the full range of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties. The jury should not be constrained by the fact that the
 
 *713
 
 prosecution and defense have chosen to focus on certain theories.”
 
 (People
 
 v.
 
 Wickersham
 
 (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].)
 

 The court did not indiscriminately instruct on all potential lesser included offenses. It honored defendant’s request to forsake manslaughter instructions. Nevertheless, defendant insists the defense was predicated on mistaken identity and alibi and, since there was no evidence of provocation, heat of passion, or mutual combat, there was no evidentiary basis for a second degree murder finding.
 

 The record clearly reflects the prosecution did not pursue a second degree murder conviction predicated on implied malice. Rather the court presented the jury with a vehicle for concluding the victim had been murdered but without premeditation and deliberation. Given the wanton nature of the injuries, the jury may have entertained a reasonable doubt the execution was preplanned and deliberate. The court properly dispensed its role of presenting the full range of possible verdicts unemcumbered by the strategy of both the prosecution and defense to force an all-or-nothing choice to the charge of first degree murder.
 

 Neither
 
 People
 
 v.
 
 Cooper
 
 (1991) 53 Cal.3d 771 [281 Cal.Rptr. 90, 809 P.2d 865] nor
 
 People
 
 v.
 
 Bunyard
 
 (1988) 45 Cal.3d 1189 [249 Cal.Rptr. 71, 756 P.2d 795], relied upon by the defendant, compels a different result. In
 
 Cooper,
 
 the Supreme Court did not address whether the trial court erred by failing to instruct on second degree murder because the error, if any, was invited.
 
 (People
 
 v.
 
 Cooper, supra,
 
 53 Cal.3d at p. 827.) In
 
 Bunyard,
 
 the court found untenable the defendant’s argument that although he may have premeditated the killing of his pregnant wife, he only entertained a callous and wanton disregard for the nine-month fetus, not a deliberated intent to murder the child. The court observed the defendant’s testimony “did not address his mental state toward Baby Girl Bunyard when he formulated the murder-for-hire plan or facilitated its execution. Thus, the trial court was not obligated to give instructions on second degree murder based on an implied malice theory.”
 
 (People
 
 v.
 
 Bunyard, supra,
 
 45 Cal.3d 1189, 1234.)
 

 In both cases, the lesser included offense instruction was not given and the defendants complained on appeal that contrary to the position they took during trial, the trial courts erred by failing to instruct sua sponte on second degree murder. Here, however, defendant’s objection is lodged at the court for giving, not withholding, the lesser included offense instruction.
 
 Cooper
 
 and
 
 Bunyard
 
 are of no assistance because both involved the application of the invited error doctrine whereby a defendant is precluding from reaping
 
 *714
 
 the benefits of errors committed at his urging. Here the trial court was not seduced into committing instructional error by giving, over defendant’s objection, a second degree murder instruction. Since the inferences to be drawn from the circumstantial evidence of a brutal beating and execution equally support either premeditated or unpremeditated killing, the court properly instructed the jury on the full range of possible verdicts supported by the evidence.
 

 Defendant’s next onslaught on an alleged series of instructional errors tries our appellate patience and detracts from the merits of the more viable contentions. We respond with appropriate brevity. Defendant misunderstands the scope of the trial court’s obligation to instruct sua sponte. While the court has the obligation to instruct on general legal principles so central to the determination of guilt or innocence that to ensure a fair trial they must be explained to the jury
 
 (People
 
 v.
 
 Sering
 
 (1991) 232 Cal.App.3d 677, 687 [283 Cal.Rptr. 507]), it is not incumbent upon the trial court to instruct on specific points developed at trial.
 
 (People
 
 v.
 
 Flannel
 
 (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1].)
 

 Specifically, the court did not have an obligation to instruct sua sponte on the niceties of the law concerning motive nor to fashion a combination instruction coupling principles of motive and opportunity.
 
 (People
 
 v.
 
 Cox
 
 (1991) 53 Cal.3d 618, 669 [280 Cal.Rptr. 692, 809 P.2d 351].) The motive instruction, allowing the jury to ascribe to the presence or absence of motive evidence the weight to which it is entitled, is an accurate statement of the law. (Evid. Code, § 312.) Finally, the court was not required to instruct on the law of solicitation because defendant was not charged with solicitation, solicitation is not a lesser offense included in murder, the prosecution did not urge a solicitation verdict, and there was not substantial evidence to support a finding defendant was guilty only of solicitation, but not murder. We agree with the Attorney General that defendant’s acts of soliciting Benjamin Ortiz’s help were part of a grander scheme of aiding and abetting the murder. In sum, defendant is not entitled to remain mute at trial and scream foul on appeal for the court’s failure to expand, modify, and refine standardized jury instructions.
 

 B.
 
 The Prosecutor’s Closing Argument
 

 Defendant claims the trial court erroneously absolved the prosecutor of prejudicial
 
 Griffin
 
 error.
 
 (Griffin
 
 v.
 
 California
 
 (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) During rebuttal, the prosecutor responded to defense counsel’s attempt to equate the conduct of the defendant with the conduct of Pete Baloo. The prosecutor argued: “Well, keep in mind the difference between the two. There’s been no evidence whatsoever of any
 
 *715
 
 animosity between Pete and Fritz. There’s no evidence whatsoever of confrontation between Pete and Fritz especially on the day that Fritz got murdered. In fact, the evidence is to the contrary, that they were together having beers, apparently getting along fine, Pete and Fritz.
 

 “There is no evidence at all that Pete was at the restaurant [at] midnight cleaning up. There’s no meetings between Pete and Benjamin Ortiz the day of Fritz’ murder and the day after. It’s the defendant who points out the blood at the restaurant. That’s by Pete Baloo’s testimony, but that’s the only evidence on that issue and it hasn’t been challenged.
 

 “It’s the defendant who comes up with the plan to buy the wine and, again, Pete Baloo’s testimony is the only testimony on that point, and it hasn’t been challenged.”
 

 “Under the rule in
 
 Griffin,
 
 error is committed whenever the prosecution or the court comments, either directly or indirectly, upon defendant’s failure to testify.”
 
 (People
 
 v.
 
 Morris
 
 (1988) 46 Cal.3d 1, 35 [249 Cal.Rptr. 119, 756 P.2d 843].)
 
 “Griffin
 
 does not preclude a prosecutor from commenting on the state of the evidence or the defendant’s failure to call logical witnesses or introduce material evidence. [Citation.] ‘[A] prosecutor is justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record.’ [Citation.]”
 
 (People
 
 v.
 
 Roberts
 
 (1975) 51 Cal.App.3d 125, 136-137 [123 Cal.Rptr. 893];
 
 People
 
 v.
 
 Mincey
 
 (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr .2d 822, 827 P.2d 388].)
 

 The prosecutor did nothing more than refute defense counsel’s closing remarks by pointing out the dearth of evidence implicating Baloo and exonerating defendant. Consequently, when taken in context, the challenged comments were nothing more than legitimate rebuttal highlighting the state of the evidence. The trial court properly concluded there was no
 
 Griffin
 
 error.
 

 C.
 
 Juror Misconduct
 

 Defendant next complains of juror misconduct. The trial court denied defendant’s motion for a new trial based on a single juror’s affidavit. The juror declared he found defendant guilty of second degree murder only because the lesser included offense of accessory after the fact was taken away, and disclosed that another juror drew a map clarifying the confusing map drawn by witness Pete Baloo. We review the denial of the new trial motion for an abuse of discretion.
 
 (People
 
 v.
 
 Clair
 
 (1992) 2 Cal.4th 629, 667 [7 Cal.Rptr.2d 564, 828 P.2d 705].)
 

 Evidence Code section 1150, subdivision (a) provides: “Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be
 
 *716
 
 received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.”
 

 The trial court conducted an evidentiary hearing to determine whether the allegations of misconduct were substantiated. The court granted a prosecution motion to strike all the testimony related to the juror’s state of mind pursuant to Evidence Code section 1150. That testimony described the juror’s subjective deliberative process and was clearly inadmissible. As the Supreme Court emphasized in
 
 People
 
 v.
 
 Hedgecock
 
 (1990) 51 Cal.3d 395, 418 [272 Cal.Rptr. 803, 795 P.2d 1260]: “[W]hen considering evidence regarding the jurors’ deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150. The statute may be violated not only by the admission of jurors’ testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations. In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror’s mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.”
 

 Even if the juror’s venture into cartography constituted misconduct, “. . . the presumption of prejudice is rebutted when there is no substantial likelihood that the vote of one or more of the jurors was influenced by exposure to the improper material.”
 
 (People
 
 v.
 
 Mincey, supra,
 
 2 Cal.4th at p. 467.) Baloo’s map depicted alternate routes to Floratech to determine whether the defendant purposely chose the bridge overlooking their restaurant. This element was an extremely thin thread of the circumstantial web. Moreover, the juror’s map was favorable to the defendant, illustrating there was no difference between the route taken by the defendant and the alternate routes available. With little difficulty, we conclude there is no substantial likelihood the map influenced one or more of the jurors.
 

 D.
 
 The Verdict
 

 Although the defendant was charged with being an accessory after the fact, the trial court granted the prosecution’s motion to dismiss the accessory count on the first day of trial. Nevertheless, the defendant requested an
 
 *717
 
 accessory instruction and argued he was guilty
 
 at most
 
 as an accessory after the murder was completed. The trial court instructed the jury: “Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the specific intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is guilty of the crime of accessory to a felony in violation of Penal Code Section 32.” Although the defendant argued to the jury and the court instructed the jury on liability as an accessory, defendant insisted the jury should not be given a verdict form to correspond to an accessory finding.
 

 In its second full day of deliberations, the jury attached an inquiry to a copy of CALJIC No. 8.75 which reads: “May we consider any lesser crime such as accessory? If so, what are the instructions?” Defendant encouraged the court to submit an advisory verdict form to the jury in which the defendant could be found guilty as an accessory. The court refused, explaining, “Accessory after the fact. . . is not a viable verdict in the present state of the record in this matter, and the Court will not instruct the jury that they can return an advisory verdict. . . that has utterly no value whatever. That’s not being, in my judgment, honest with the jury as such.”
 

 The court then instructed the jury, “You may consider anything covered by the instructions in this case. You may not return a verdict in the posture of this case save and except as it relates to a guilty or not guilty verdict on 1st or 2nd degree murder. [¶] Any finding in this matter must be in accordance with all instructions given.” After three more days of deliberation, the jury returned its verdict convicting defendant of murder in the second degree.
 

 Defendant contends the trial court erred by refusing to submit an advisory verdict form to the jury following its inquiry. Defendant argues a conviction as an accessory is the equivalent of a finding of acquittal as to murder. The Attorney General claims that any error committed by the trial court, whether instructional or in providing incomplete verdict forms, was expressly invited by the defense. Although the issue requires further analysis of the trial court’s obligation to instruct on lesser related offenses to determine if and when that obligation encompasses the submission of verdict forms consistent with the instructions, we agree the error, if any, was invited.
 

 In
 
 People
 
 v.
 
 Geiger
 
 (1984) 35 Cal.3d 510, 514 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] the Supreme Court announced, “[W]e find no
 
 *718
 
 reason in law, justice, or common sense why a jury that is not persuaded of the defendant’s guilt of the charged offense should not have the opportunity to find him guilty of a lesser related offense where ... the lesser offense is closely related to that charged, there is evidence of its commission, and defendant’s theory of defense is consistent with such a finding.” Unlike the obligation of the trial court to instruct sua sponte on all lesser included offenses
 
 (People
 
 v.
 
 Sedeno
 
 (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913]), “. . . there is no obligation to instruct on related offenses in the absence of a request by the defendant for such instructions.”
 
 (People
 
 v.
 
 Geiger, supra,
 
 35 Cal.3d at p. 530.)
 

 The court dispelled the prosecution’s fear that requested instructions would be translated into another obligation to instruct sua sponte. “The principal impediment to instructions on related, but not necessarily included, offenses is the defendant’s right to notice adequate to permit him to prepare his defense. That right is not a concern, however, when a defendant requests conviction of a related offense. A defendant may not be ‘convicted of an offense which is neither specifically charged in the accusatory pleading nor “necessarily included” within a charged offense,
 
 when he does not consent to the substituted charge.
 
 ...’[¶] Where, however, the defendant himself requests the instruction on a related offense there is no constitutional bar. Obviously, such a defendant cannot claim lack of notice.” (35 Cal.3d at p. 526.)
 

 Defendant’s strategy at trial was to gamble on an acquittal by presenting the jury with an all-or-nothing choice.
 
 Geiger's
 
 rationale, however, was the logical extension of the court’s aversion to such a strategy. As the court explained in
 
 People
 
 v.
 
 St. Martin
 
 (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390]: “The state has no interest in a defendant obtaining an acquittal where he is innocent of the primary offense charged but guilty of a necessarily included offense. Nor has the state any legitimate interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth.”
 

 Defendant ingeniously upped the ante by requesting the
 
 Geiger
 
 instruction, but convincing the court to withhold an accessory verdict. As a consequence, he received more, not less, than he deserved. Once he requested the instruction the jury should have been provided the vehicle to
 
 *719
 
 decide in accordance with the
 
 Geiger
 
 rationale, that is to convict on the lesser related offense. It was error to distort
 
 Geiger
 
 so as to tease the jury with an accessory instruction and withhold an accessory verdict. Not surprisingly, they were totally confused and asked the court whether they could convict defendant as an accessory. We conclude that once a defendant requests an instruction on a lesser related offense, the verdict must accompany the instruction. To do otherwise is to make a mockery of the deliberative process.
 

 Defendant argues the confusion could have been eliminated by providing the jury with an advisory verdict form. An advisory verdict, the defendant urges, is an acquittal of the greater charge and the jury’s expression of reasonable doubt. A similar ploy was soundly rebuked in
 
 People
 
 v.
 
 Ognibene
 
 (1993) 12 Cal.App.4th 1286 [16 Cal.Rptr.2d 96]. In
 
 Ognibene,
 
 the defendant requested a jury instruction on a lesser related offense which was time barred. The Court of Appeal upheld the trial court’s refusal to instruct on a “phantom” offense, persuaded by the reasoning of the United States Supreme Court in
 
 Spaziano
 
 v.
 
 Florida
 
 (1984) 468 U.S. 447, 456 [82 L.Ed.2d 340, 349-350, 104 S.Ct. 3154]: “ ‘[The case law] does not require that the jury be tricked into believing that it has a choice of crimes for which to find the defendant guilty, if in reality there is no choice. Such a rule not only would undermine the public’s confidence in the criminal justice system, but it also would do a serious disservice to the goal of rationality on which [the case law] is based.’ ”
 

 The court in
 
 Ognibene
 
 found “the logic of
 
 Spaziano
 
 compelling. Any other result would amount to a triumph of form over substance and would seriously undermine the credibility of our criminal justice system. Imagine the reaction of a citizen-juror who, after finding a defendant guilty of a lesser related misdemeanor, was informed that the jury’s guilty verdict was a nullity and effectively resulted in complete acquittal. Such sleight of hand cannot be tolerated in a system which strives for openness and honesty.”
 
 (People
 
 v.
 
 Ognibene, supra,
 
 12 Cal.App.4th at p. 1290.)
 

 Defendant obtained his phantom instruction, and attempted to perpetuate the deception by providing a phantom verdict. Hence, the concerns voiced in
 
 Ognibene
 
 are even more relevant when the jury is not only given an abstract notion of related offenses but the precise means of returning a conviction on an uncharged, and therefore, unpunishable offense. Consequently, we reject defendant’s contention the error the court committed by failing to submit an accessory verdict could have been cured by providing the jury an advisory verdict as subsequently requested by the defense.
 

 Moreover, defendant is barred from challenging the court’s failure to provide an accessory verdict under “the invited error doctrine” which is
 
 *720
 
 “designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.”
 
 (People
 
 v.
 
 Wickersham, supra,
 
 32 Cal.3d at p. 330.) The record must reflect an express tactical choice by defense counsel.
 
 (People
 
 v.
 
 Bunyard, supra,
 
 45 Cal.3d at p. 1234.)
 

 The record is replete with examples of the defense strategy to preclude a compromise verdict. Defense counsel informed the court: “[W]e’re going to be asking that the Court instruct and tell the jury what the crime of accessory after the fact pursuant to [section] 32 of the Penal Code is, but we are not going to be asking that a verdict be submitted to them for that crime.” The defendant concurred with the tactical strategy. Following receipt of the jury’s question on accessory, the court and counsel engaged in a vigorous discussion about how to proceed. Defense counsel urged submission of an advisory verdict. The prosecution opposed, not only the submission of an advisory verdict, but also further instructions which would mislead the jury into believing they could convict the defendant as an accessory after the fact
 
 unless
 
 the defendant was willing to provide an accessory verdict. The defense would not concede. In sum, defendant steadfastly clung to his express all-or-nothing strategy. Although not entitled to an instruction on a crime for which he could not be convicted, he obtained just that. Moreover, he withheld the verdict to coincide with the instruction. Even when faced with direct evidence of the jury’s confusion and perhaps inclination to convict him as an accessory, he refused to withdraw his wager by providing an accessory verdict. Although we embrace the well-established principle that neither the state nor the defense has a legitimate interest in pursuing an all-or-nothing strategy, it is hard to imagine a clearer demonstration of invited error. “Defendant may not now complain that the court did exactly what he insisted upon.”
 
 (People
 
 v.
 
 Cooper, supra,
 
 53 Cal.3d at p. 827.)
 

 The judgment is affirmed.
 

 Puglia, P. J., concurred. Blease, J., concurred in the result.
 

 Appellant’s petition for review by the Supreme Court was denied January 4, 1995.
 

 *
 

 See footnote,
 
 ante,
 
 page 697.