Filed 9/6/13  P. v. Shawkey CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G045698 |
| v. | (Super. Ct. No. 09ZF0078) |
| GARY A. SHAWKEY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meredith White and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

On February 16, 2008, appellant Gary Shawkey and Robert Vendrick boarded a sailboat in Dana Point Harbor bound for Catalina Island. Shawkey arrived, Vendrick did not. In fact, Vendrick was never seen or heard from again. At trial, the prosecution theorized Shawkey murdered Vendrick at sea for financial gain, and the jury agreed. Shawkey contends there is insufficient evidence he killed Vendrick, and the trial court erred in admitting certain hearsay statements into evidence. Finding these contentions unmeritorious, we affirm the judgment.

FACTS

At the time of his disappearance, Vendrick was a 71-year-old retired software systems analyst. He spent most of his career in San Jose, but in 2004, he and his wife of many years moved to Phoenix. They had two children and three grandchildren, whom Vendrick spoke to and visited regularly. Vendrick's family considered him to be a loving spouse, affectionate father and doting grandfather. His wife Carole described Vendrick as "always very pleasant[,] . . . hard working and wanting to help in any way that he could, but not gregarious, somewhat naïve from his . . . growing up in Indiana on a farm, [and] somewhat gullible."

As a retiree in search of extra income, Vendrick spent much of his time on the Internet pursuing multilevel marketing schemes and other financial opportunities. He wanted to prove he could be a successful businessman, but he ended up sinking hundreds of thousands of dollars into failed financial gambits. Most of that money went to Shawkey, who was described by witnesses as a large, heavy-set man, with a jovial and gregarious demeanor. In interviews with the Orange County Sherriff's Department (OCSD), Shawkey said he was both a friend and business partner to Vendrick. Shawkey had briefly been licensed as a personal protection specialist and bail enforcement agent in Virginia, but in 2008 his licenses were revoked for violating regulations.

Shawkey and Vendrick met in late 2002, and over time they developed a financial relationship. A number of e-mails between the two men starting in June 2004

2

document their dealings. Almost all of the e-mails Vendrick received from Shawkey involved urgent pleas for some quantity of cash up front with a promise of tremendous rewards to be reaped in the immediate but unspecified future. In February 2005, Shawkey sent an e-mail to Vendrick asking if he knew "anybody who can swing about $45,000 to get [his company] through." Shawkey made a point of avoiding a direct plea for money from Vendrick, but was largely transparent about his interests and made the matter seem unduly urgent by stating "we are going to be in real trouble if I do not find somebody to bail us out." After this initial email, Vendrick inquired whether and when there would be a return on this investment, and Shawkey assured him it would be for a stake in his company and promised a net positive return within 90 days. Vendrick gave Shawkey the money, but his return never came.

By late 2005, after another business venture with Shawkey had collapsed, Vendrick had given Shawkey $239,037 in wire transfers, $10,000 in checks and another $10,500 via PayPal, an online money transfer service. At this point, Shawkey was under investigation by the Securities and Exchange Commission for fraudulently attracting investors. However, he defended himself to Vendrick by telling him he had only gotten happy e-mails from investors, and that he was "[b]ottom line scared to death. I think you are the only one left that believes in what I am doing."

In this correspondence, Shawkey said he was exhausted financially, faced $9,600 in monthly expenses, and asked Vendrick for a personal loan. This pattern continued throughout 2006, with Shawkey's requests for money to Vendrick growing ever more familiar and casual, until Vendrick in October of 2006 sent Shawkey a message that he was "strapped to the limit" financially. Throughout the course of their dealings, Vendrick was ultimately paying a significant portion of Shawkey's personal expenses, under the guise of "keeping things going" for unsubstantiated business goals.

In his next e-mail to Vendrick, Shawkey acknowledged, "I know you are in trouble with money and I will get that straight when I get out of this hell hole." In

3

February 2007, sensing that his supply of easy money was threatened, Shawkey reverted to his tactic of promising huge investment returns, claiming, "[W]e can re-coop [sic] VERY quickly. . . . [W]e will win and we will win FAST!"  When Vendrick did not respond, Shawkey e-mailed again.  Claiming he had "been contacted by Microsoft and YouTube directly," he assured Vendrick he would make his first million back within the year.

By this time, though, Vendrick had tired of Shawkey's ploys and largely run out of money.  His reply to Shawkey's newest battery of promises was that "[y]ou have said all that before about being so close and I have seen nothing.  The plan you present is meaningless if the numbers do not come in."  In a call made by Shawkey to Vendrick in 2007, Carole interrupted their conversation to berate Shawkey for taking so much of their retirement money.  Shawkey responded "you're going to get it back.  The accounts are all set up."

Vendrick decided for the first time in 2007 to prepare and file his taxes himself instead of through a CPA or tax service.  It did not go well for him.  He under-reported his income and assets by a substantial amount and faced a number of financial penalties as a consequence of his miscalculations.

At Carole's insistence, Vendrick hired an attorney, Leo Pruett, to assist him in recouping his money from Shawkey.  At this time, Carole discovered Vendrick had been sending money to Shawkey behind her back.  She also learned about a secret P.O. Box Vendrick had been using and insisted he close it.  Vendrick acquiesced, but nevertheless renewed the mailbox shortly before his disappearance.  Pruett sent Shawkey a letter asking for documentation of his business ventures, but Shawkey never replied or mentioned the letter to Vendrick.

Around this period, Vendrick sent Shawkey a desperate email, saying "Taxes killed any hope of my surviving."  He asked Shawkey if there was any news that might help him financially, and Shawkey responded with a new angle.  He told Vendrick

4

he was seeking a grant to provide unspecified computer services for the federal government, saying "we own all of the equipment and programs and they are all password protected." Vendrick was intrigued. Having already invested around a million dollars with Shawkey, he was excited about the prospect of recouping his money and urged Shawkey to apply for the grant immediately. Shawkey thanked Vendrick for being patient while "things have not gone as planned." And, as he had done so many times before, he promised Vendrick the deal would bring him great financial reward.

After a few more e-mails asking for immediate last-minute funds, Shawkey told Vendrick in early 2008 that he was coming to Phoenix to meet with him personally about the computer project. On February 3, 2008, Vendrick replied he was "somewhat confused as to the reason for [Shawkey] coming to Phoenix. . . . My wife thinks the lawyer needs to review the forms before I sign anything. [¶] . . . Is this just another carrot you are putting before me without any actual contract? [¶] I am in a very desperate situation financially!"

Despite his reservations, Vendrick agreed to meet Shawkey in Phoenix on February 9, 2008. In the wake of that meeting, Vendrick told his wife that Shawkey had arranged a secret, computer-related deal with the federal government involving 22 different agencies. Even though Vendrick was something of an expert with computers, he told Carole he had no idea what the deal was about. He also said that in order to facilitate the deal, he and Shawkey would be travelling by boat to San Clemente Island, a military-owned island roughly 25 nautical miles south of Catalina Island.

At Carole's behest, Vendrick met with attorney Pruett on February 11, 2008, before heading off to California. Vendrick told Pruett he and Shawkey were planning on doing business with a variety of federal agencies, and the terms of this arrangement were supposed to net him $1.2 million sometime around February 19, with an additional $600,000 per year for the next five years. Vendrick also told Pruett that in order to finalize the deal, he (Vendrick) would have to open a $100,000 account at Wells

5

Fargo. Vendrick repeated the secrecy of the deal to Pruett and said he had to go to California for several days of training on the use of federal "forms and procedures." Vendrick also stated Shawkey would be making arrangements for the two of them to travel together to San Clemente Island.

Before leaving for California, Vendrick attempted to register a limited liability corporation with an online service. The name of the corporation was to be "GSRV," the initials of Gary Shawkey and Robert Vendrick, and its stated purpose was software development. Shawkey and Vendrick were the sole shareholders, with Vendrick occupying all the managing board positions. The corporation's billing and shipping addresses were both in Phoenix, but parts of the online form were not completed, so the LLC was never formally registered.

On February 13, two days before departing to California, Vendrick called his younger brother, Charles Frederick Vendrick (Fred), who lives in Hermosa Beach, to ask for a short-term personal loan of $40,000. Vendrick had only $60,000 of sufficiently liquid funds to put into the Wells Fargo account, and turned to his brother for assistance in raising the $100,000 Shawkey had insisted upon. Vendrick told Fred the money was to secure a government contract, promised him an immediate return plus an extra $10,000 on top of his investment, and insisted the repayment be formalized and notarized as a written contract with payment due by April 7, 2008. Vendrick did not tell Fred he would be coming to California in the imminent future, nor did he elaborate on the nature of the contract or provide any paperwork to substantiate his claim. Nevertheless, Fred trusted his brother, and on February 14, he wired Vendrick $40,000 to a designated account at Wells Fargo.

That same day, Vendrick purchased a round trip airline ticket from Phoenix to California, with a departure set for February 15 and a return on February 18, with a rental car reservation for the same period. After flying into Long Beach on the 15th, Vendrick met Shawkey at the Dana Point Marina. The two men were together when

6

Vendrick checked into the Marina Inn at 3:30 p.m. After checking in, Vendrick called his wife to let her know which hotel he was staying in. He also told her that he and Shawkey were going to San Clemente Island the following morning to finalize the computer deal.

After checking into his hotel room, Vendrick also called Sharlene Slama, who lived in Turlock, California and was then 67 years old. Vendrick first met Slama in 2001, when he was still living in San Jose. Over time, they developed a romantic relationship, and after Vendrick moved to Arizona, they saw each other when Vendrick would travel to business seminars around the country. At Vendrick's invitation, Slama made the seven-hour drive to Dana Point and spent the night with him at the Marina Inn.

Shawkey had stayed at that hotel the night before, on February 14, but he did not stay there on the 15th, which was the day before Vendrick went missing. Prior to that time, Shawkey had been very busy.[1] After travelling from Virginia to Phoenix to meet Vendrick on February 9, Shawkey took a bus to Los Angeles and arrived there the next morning. From there, he made his way by bus and cab to Laguna Beach, whereupon he started looking for a boat to buy. During this period, Shawkey "got drunk [in Dana Point] a couple nights" and took several trips to Catalina Island. Records from the Catalina Express indicate Shawkey travelled from San Pedro to Catalina on February 10, returned the next day, and then made a round-trip voyage from Dana Point to Catalina on the 13th.

The night of February 12, Shawkey was in a bar in Huntington Beach, where he met a Chilean abalone farmer named Carlos. Supposedly, he and Carlos agreed to have Shawkey and Vendrick travel to Chile to install underwater anti-piracy fencing around Carlos' threatened livelihood. In fact, neither Shawkey nor Vendrick had any experience doing such. Shawkey told the police that, with the help of "positive

---

[1] Our description of Shawkey's activities during this time is based on what he told investigators in the wake of Vendrick's disappearance. Shawkey did not testify at trial.

7

thinking," he intended to learn the trade upon arriving in Chile. However, he never turned over any promised information on Carlos or his abalone company. And when investigators spoke with Carlos about the supposed agreement, he told them the entire proposal was a ludicrous idea to which he never gave any serious thought.

On February 13, Shawkey purchased a sailboat, *The Odyssey*, in Dana Point from Tom Smith for $1,000. The following day, Smith took Shawkey out on the water for a couple of hours to show him how the boat functioned. The vessel had two anchors on it, which Smith showed Shawkey how to use in different depths of water. Both of the anchors were functioning normally at this time. Shawkey asked Smith how to run the engine, steer the boat, and anchor it, but he had no interest in learning how to sail. Shawkey would later claim to investigators that Smith did not take him past the breakwater, and only demonstrated to him how to use the front anchor, not the rear one.

The night of February 14, Shawkey stayed at the Marina Inn, where Vendrick would stay the following night, but he was only permitted to stay a single night because his credit card was not authorized. He would spend subsequent nights in the cabin aboard *The Odyssey*.

The next morning, before he met Vendrick, Shawkey went to West Marine, a marine and hardware store in Dana Point. He checked out at 9:52 a.m., purchasing a handheld depth finder, batteries, an 18-pound river anchor, a paint tray and roller, a first aid kit, an outboard 9.9 horsepower engine and a tool kit, for a total of $2,500, which he paid in cash.[2] Shawkey did not have a vehicle, so the sales associate drove him back to the sport fishing wharf area of the Dana Point Harbor, where Shawkey had left his vessel. However, while he was out shopping, Shawkey's boat was towed, because he had not

_____

[2] The river, or "mushroom," anchor is especially noteworthy, as river anchors are useless for embedding on the sea floor; their shape is designed for the rockier, more irregular bottoms of rivers, and do little more than bounce along the top of the sandy ocean shelf.

rented a slip and had left *The Odyssey* parked in an area only permitted for the sport fishing fleet.

At the harbor patrol impound, Shawkey was able to recover his vessel, and while he was there, he went about installing the new engine to replace the old one, which was in a questionable state of repair. A deputy sheriff offered to assist him with the new engine, which appeared heavy, but Shawkey hoisted the machine easily into place without any help. When the deputy commented upon this feat, Shawkey told him that he should see him "when he has to take down a 300-pound man" and that "he was a bounty hunter/bail bondsman from back east" who had made over 1,000 arrests. His bounty hunting work "for the government" supposedly "took him up and down the state" so he had purchased the boat to travel and live aboard to save money on hotels. Shawkey asked the deputy if he could leave his old engine with the harbor patrol, but the deputy rejected the idea and directed Shawkey to the fuel dock as a location to sell or donate it.[3]

Later that day, Shawkey again illegally parked *The Odyssey* in a slip belonging to a private owner. The owner's friend, Leo George, asked whether Shawkey knew he was in another person's slip. Shawkey replied he did not, but that he had to go and meet his friend to prepare to go to Catalina Island. Shawkey then left *The Odyssey* momentarily to go and get Vendrick. While he was gone, George boarded *The Odyssey* out of curiosity and found the cabin "a total mess." He also noticed the new mushroom river anchor. When Shawkey returned with Vendrick, George helped walk them out of the slip and off into the water at roughly 5:00 p.m.

As explained above, Vendrick had checked into his hotel not long before then. Hotel records for that day, February 15, show the door to Vendrick's hotel room was opened with the room's key at 4:08 p.m., 4:31 p.m., 9:44 p.m. and 11:05 p.m.

---

[3] There is much ado made about the final resting place of Shawkey's original engine, but we find that particular controversy overcomplicated, irresolvable, and ultimately irrelevant to the jury's verdict. The most logical conclusion is that Shawkey likely dumped the engine carelessly in the water off the isthmus of Catalina Island, where an engine was later found by a recreational scuba diver.

Shawkey told police that he and Vendrick, after taking the boat out briefly, returned with it to the fuel dock at Dana Point Harbor and had dinner at Turk's, a restaurant along the harbor's main commercial strip, before going to buy items for the boat. At around 7:00 p.m., they went to a Target store in Dana Point in Vendrick's rented PT Cruiser, and Shawkey bought several items while Vendrick purchased only a windbreaker. Shawkey told investigators Vendrick also bought a card to make phone calls, but Target records and a receipt later found in Vendrick's hotel room showed no such purchase. Shawkey also claimed he and Vendrick visited a nearby CVS Pharmacy that evening, so Vendrick could get a new glucometer and insulin supplies for his (Vendrick's) diabetes. However, the sales records of the CVS showed no such purchase.

Shawkey also told police that, when he was with Vendrick that night, he noticed that Vendrick was in possession of a large duffel bag containing between $200,000 and $500,000. Shawkey claimed he noticed the money when Vendrick fished through the bag to find a cell phone charger. That evening, Shawkey rented a slip and slept on *The Odyssey*, and Vendrick stayed in his hotel room with Slama.

The next morning, Slama awoke to find Vendrick was already awake. She made him breakfast, and he told her he had to go to Catalina Island to "meet his boss" and "clear some big, money-making deal." Vendrick was excited about the deal, but he seemed hesitant about getting on the boat with Shawkey; neither of them had any experience boating or sailing, much less navigating a vessel in open water. Vendrick told Slama to wait at the hotel, and he would be back some point that day, though he couldn't say exactly when. He did not ask Slama if she wanted to come along with him. Nor did he say anything about going sailing with her, going to Mexico, Bike Week in Florida, travelling to Chile, or lobster fishing.

When he left Slama that morning, Vendrick took nothing with him except his wallet and cell phone, leaving his computer, suitcase, and his diabetes medication in the room. He then drove to meet Shawkey at *The Odyssey*. Surveillance cameras on

10

local businesses recorded a light going on aboard the boat at 5:58 a.m., Vendrick's rental car pulling in nearby a minute later, and then an hour later, at 7:04 a.m., the boat pulled away. A fuel dock attendant identified Vendrick and Shawkey as her third customer that morning, and a receipt showed their purchase of gas for the boat at 7:50 a.m. The attendant saw Vendrick moving about from the cabin to the cockpit and back again as they were at the fuel dock. The boat then motored out to sea.

Because neither Shawkey nor Vendrick knew how to sail, the boat could only be powered by the 9.9 horsepower engine that Shawkey had purchased. That engine, known as a "kicker," had a top speed of about 5 knots. Since boating conditions were optimal that day, it should have taken Shawkey and Vendrick about five hours and forty-five minutes to travel from the Dana Point breakwater to the Avalon Harbor on Catalina Island. A nautical expert who examined *The Odyssey* before trial found no issues with the keel of the boat, its rudder, or any other parts of it.

While en route to Catalina, Shawkey left a series of voicemails on Vendrick's cell phone that indicated that something was amiss. At 11:06 a.m., he left a message informing Vendrick he was halfway to Catalina and had roughly three hours left before he got there and commenting that he hoped Vendrick had made it on the Catalina Express ferry. Shawkey left two more messages around 2:30 p.m., one that there was an issue with *The Odyssey*'s keel and that there would be a delay, and another giving Vendrick a location in Avalon to meet him at with Slama that evening. At 4:01 and 4:52 p.m., Shawkey left messages asking why Vendrick had not called him back and asking him "[w]hat's going on?"

At 5:00 p.m., nine hours after his departure, Shawkey arrived alone in Avalon Harbor. Seeking mooring for his boat, he took advantage of an off-season sale and bought seven nights in advance. The next morning at about 9:00 a.m., Shawkey had a conversation with dock master Paul Bates of the Avalon Harbor Patrol. Shawkey told Bates his "partner" had become seasick, so he dropped him off in Long Beach the

11

previous day.  Claiming he had never been to Avalon before, he asked Bates if he knew of any good places to store his boat while he took a month-long job as a commercial diver in Chile.  Shawkey never mentioned where he had sailed to Catalina Island from, nor did he specify where in Long Beach he had dropped off his partner.  Bates returned to Shawkey's moor around noon, by which time Shawkey had departed.

Following Vendrick's departure from Dana Point on the morning of the 16th, Slama stayed in his hotel room all that day, and during that time, Vendrick never returned for his belongings.  Slama left for home the next morning, thinking Vendrick and Shawkey had run off on some adventure and she should not worry over boys being boys.

Shawkey continued to leave odd voicemails for Vendrick after arriving on Catalina Island.  He made reference to Vendrick and Slama getting a hotel on Catalina per some fictitious preexisting arrangement, spoke to Vendrick as "bro," and expressed confusion that he and Slama were not meeting him for dinner as they were supposed to.  The next morning, Shawkey left several more messages.  He first asked Vendrick if he and Slama had departed, and in so doing, had "follow[ed] through with the plan."  An hour later, another message said, "You got [Slama] to come up here.  You want me to take you down to Mexico.  I have the whole thing set up.  I'm sitting over here on Catalina Island ready to go.  I've got charts.  I've got everything planned and I — you're not calling me back."

After another hour, Shawkey left another message, following the same trend:  "I've been holding all this money for you, saving it for you so you could do what you gotta do with [Slama] and everything was fine yesterday morning and then you decided you didn't want to take the boat across and have her take the ferry, whatever.  You — then, that's the last time I talked to you.  And the night before we had dinner, all the plans were made.  I got the boat for — to take you to Mexico.  I'm going to San Diego.  Okay? . . . Because that's where I'm taking the flight out of to go to, uh, Florida

to handle what I need to handle over there.  Okay?  . . . I mean I feel like I'm being set up or something."

That evening, Shawkey called again, assuring Vendrick he would not tell Carole about Slama or his "running off" without "giving anybody any info."  In that regard, Shawkey told Vendrick he was "doing [his] job" and doing what Vendrick "paid [him] to do."  Shawkey's final voicemail was left the next morning, February 18, during which he said, "[E]verything was a go for — everything down in Chile.  Everything in the San Juan Islands.  I don't understand why you're not calling me . . . ."

On February 17, Shawkey travelled from Avalon to Two Harbors, a small town on the northern end of Catalina Island, where he stayed briefly, and from there, he piloted *The Odyssey* to Long Beach.  The evening of February 18, he was in Buster's Beach House, a bar in Long Beach, where he talked with the bartender and told her he was a commercial lobster fisherman out checking his traps.  Because of water damage, his cell phone was unusable, and he borrowed another customer's to call his wife in Virginia.  He told the bartender that he was on his way to the Port of Los Angeles and had pulled into Buster's because of bad weather.  He had a friendly demeanor, but at no point mentioned having a missing friend or that he had been travelling with anyone.  He eventually left to return to his boat where he drank extensively, as he had done every night since arriving in California.

The next morning, February 19, Shawkey took a taxi around Long Beach, stopping at a Payless Shoe Store to buy new shoes, a cell phone store, a CVS for phone cards, a Wells Fargo branch, the DMV to register his boat, and then back to Wells Fargo a second time.  He twice stopped at pay phones to make calls, and again never mentioned having a missing friend.  While they were in the car, Shawkey asked the taxi driver if he knew anyone who was interested in buying a boat, as Shawkey intended to go to Cuba.

Monique Farfan, the assistant manager of the Wells Fargo Shawkey visited, testified Shawkey entered the bank first at around 9:30 a.m., seeking to withdraw $30,000

13

in cash and process a $60,000 wire transfer. She could not allow him to withdraw that much cash, but processed the wire, and Shawkey said he would come back later. He returned just before noon and asked for a $30,000 cashier's check to purchase a Harley Davidson motorcycle. The wire he had requested earlier was blocked by Wells Fargo's Wire Investigation Division, and Farfan told him there was a problem with processing it, but did not elaborate about the reason for the block.

Shawkey told Farfan the money should be available and it was sent to him "because he was doing business and he was going to take a boat out . . . somewhere along Chile for some type of fishing business," also commenting that "a man named Robert was his business partner and that's where the funds were coming from." He also told her he was meeting Robert in Chile, but did not say anything to the effect that Robert was missing. While Shawkey was polite in the bank with Farfan, his taxi driver said he was irritated and agitated when he got back to the cab.[4]

The two calls Shawkey had made that day were to the OCSD, which he called because his wife told him that investigators were looking for him and because missing persons pictures of Vendrick had begun appearing in local media outlets. He told the watch commander on the phone he was supposed to meet Vendrick in Dana Point, he had been leaving messages for Vendrick since Saturday on his voicemail, and Vendrick had likely gone to Chile with Slama.

After Vendrick failed to make his flight back to Phoenix, his wife called the police to report him missing, and an investigation into his whereabouts was commenced. Vendrick's rental PT Cruiser was found locked where it was parked the morning he and Shawkey departed for Avalon. Inside the vehicle investigators found a white napkin with a shopping list for the trip[5] and a single page printout of a "Distribution Directive." The

---

[4]      Evidently, Shawkey also dropped a rather large wad of cash on the sidewalk on the way back to his waiting cab, which was picked up by a passing pedestrian and returned to him.

[5]      Cable, blankets, water, pillows, generator, heater.

document called for an initial disbursement of $45,000 to Fred Vendrick on March 1, 2008 for "seed money." It was not signed, but it did contain signature lines for Robert Vendrick and Gary Shawkey. The document also had Shawkey's DNA on it. With Shawkey's consent, the police also searched *The Odyssey*. They found a messy cabin with a single sleeping bag and documentation of Shawkey's $60,000 wire transfer to his wife in Virginia. On February 22, a search warrant was issued for *The Odyssey*, but nothing more was found of any relevance. None of Vendrick's blood or DNA was found aboard the vessel, and not a trace of him was found in the waters around Dana Point.

Deputies also entered Vendrick's room at the Marina Inn the evening of February 18, shortly after Carole had called to report Vendrick missing. They found the room neat, a laptop on the table open and running, the room's fireplace turned on, a suitcase on the luggage stand with folded clothing inside it, a Target receipt for a windbreaker, and a nylon medical kit containing Vendrick's insulin in the refrigerator. Upon leaving, the investigators instructed the hotel's staff not to allow anybody to disturb the room. Unfortunately, the staff called Vendrick's brother Fred to have him collect Vendrick's things, which he did the next day.

Shawkey's first account of the voyage was several days later, to OCSD Deputy Mike Thompson, the lead investigator on the case. Shawkey called Thompson from Long Beach and said that after he and Vendrick set out from Dana Point, they were only about half a mile past the breakwater when Vendrick became uncomfortable with the boat. Shawkey turned *The Odyssey* around and dropped Vendrick off on the dock in front of Turk's. Then Vendrick told him he was going to get Slama, check out from the hotel, and meet him on Catalina. At that point, Shawkey made the voyage to Catalina alone. Upon arrival, he checked all the hotels there, then headed back the next morning to try to catch Vendrick at John Wayne airport.

In speaking with Thompson, Shawkey also provided the first of what would be many colorful descriptions of all the ways in which Vendrick supposedly hated his

wife. Shawkey also talked about the prospect of him and Vendrick meeting Carlos in Chile at the end of April. Shawkey surmised Vendrick was going to go to Chile with Slama by travelling through Mexico, Brazil and Panama, and he (Shawkey) was going to meet them there, after first going to "Bike Week," a large motorcycle festival in Daytona, Florida.

Shawkey further claimed that the $60,000 Vendrick had transferred to him was for buying the boat, dive gear, and other things to go to Chile.[6] He complained at some length about his inability to access the $60,000, which left him unable to get to Daytona or Chile. Shawkey said he had wired the money to his wife so she could have it sent to him wherever he went around the world, saying international wiring laws would prevent him from accessing the Wells Fargo account while he was abroad. He also brought up Vendrick's duffel bag, claiming it contained hundreds of thousands of dollars in hundred-dollar bills.

Later that night, Shawkey was taken by Thompson and his partner, Investigator Ken Hoffman, to the Long Beach Police Department Headquarters to conduct a more formal interview. Shawkey then told them about Vendrick's Schwab account, which his wife supposedly did not know about, which contained money Vendrick used to help pay for Shawkey's expenses and to finance their various and sundry business ventures. This, he explained, was also the progenitor of the duffel bag full of cash that he described, claiming that whenever Vendrick would give Shawkey large personal payments of this kind, he expected any remaining balance to be delivered back to him in cash.

According to Shawkey, the net result of this was that Vendrick had given him about a million dollars in wire transfers and checks, etc., and he had ultimately returned a half a million in cash to Vendrick. Shawkey claimed proof of this arrangement

---

[6]     Of course, Shawkey had yet to meet Carlos or have any pipe dreams of travelling to Chile at the time Vendrick transferred the $60,000, and Vendrick never actually met Carlos.

16

could be found in what were surely hundreds of thousands of dollars in cash withdrawals from his own accounts. However, that claim was tested and disproved by forensic accountants.[7]

Shawkey then lodged several more protests and complaints about how the money in the Wells Fargo account was rightfully his to do with as he pleased, citing as authority the fact Vendrick had been giving him money for years. Shawkey told the investigators he was going to go to Florida to look for Vendrick, who was as surely there as he had been surely on his way to Chile in their previous conversation.[8]

Shawkey then asserted Vendrick had left his diabetes medication in his hotel room because of the difficulty he would surely face trying to bring it into Chile. He also commented that it was "weird" that Vendrick did not bring any of his belongings with him on *The Odyssey,* trying to build the case that Vendrick had tried to run off without Shawkey, framing him for his disappearance in the process.

Shawkey claimed Vendrick had a tremendous gambling habit, and he had seen him personally spend $5,000 playing a single game of craps. He also said Vendrick had a "party life and hookers" that nobody else in his life knew about because of Vendrick's illogical, extreme transformations which Shawkey likened to Dr. Jekyll and Mr. Hyde. He also later claimed Vendrick had been suicidal in Las Vegas the previous year. After the investigators pointed out to Shawkey a number of gigantic holes in his plan to become the commercial lobster fisherman he already had claimed to be, Shawkey

---

[7] A senior forensic accountant with the Orange County District Attorney's office conducted a full analysis of transactions made between Vendrick and Shawkey from May 2004 to February 2008. Shawkey only twice transferred funds in any way to Vendrick, totaling roughly $2,700, while Vendrick had given Shawkey roughly $907,000. And no evidence was found of any surreptitious cash withdrawals or hand transfers from Shawkey to Vendrick, in contrast to what Shawkey would later assert to investigators. All cash withdrawals made by Shawkey from any ATM or account during that period totaled under $200,000.

[8] The sheer volume of Shawkey's claims about himself defies description. A *condensed* list would include claims that he is a commercial diver, security officer, security installation specialist, a bodyguard for rock stars, a gifted writer, that he pioneered a new form of dieting that allows one to lose weight simply by drinking copious quantities of Bacardi and Diet Coca-Cola, that he has worked with NASCAR, and that he holds the world record for walking barefoot across hot coals.

changed his story so that instead of this being the plan he and Vendrick had originally devised, now it was one which Shawkey had put together independently.

When forced to return to matters of substance, Shawkey told investigators about his old engine that he had abandoned and that he had also lost an anchor the morning he returned from Catalina Island to Long Beach. That anchor, one of the two that was originally on *The Odyssey* when Shawkey had purchased it, was later recovered by an OCSD dive team after they had Shawkey return to the area to point out exactly where it was lost. However, it was not until investigators had conducted a more thorough examination of Shawkey's story that they uncovered his purchase of the river anchor from West Marine. At no point did Shawkey disclose this purchase or the anchor's loss either while assisting the dive team or in interviews.

In a follow-up interview on February 20, Shawkey attempted to patch holes in his stories about the use of the sailboat for fishing, his agreement with Carlos to build underwater fencing, and the purpose of the Wells Fargo account. He admitted he had no actual underwater welding experience, nor any truly marketable skills that Carlos may have found a use for. The story about the $100,000 account became one wherein the money was a "gift" to "keep things going" and cover Shawkey's day-to-day expenses. Vendrick had asked Shawkey how much he would need to "last a few months" and then sent the money no questions asked. Shawkey also denied any and all knowledge of any government contracts, writing off the possibility as a story that *Vendrick* made up for some reason. He also claimed that all of the money given to him by Vendrick over the last six years was not an investment, but simply "good time" money.

In another interview on February 23, Shawkey revisited his story about his meeting with Vendrick in Phoenix on February 9. Now the entire trip to California was about taking Slama sailing before the two of them gallivanted back to Bike Week in Florida, but may also have included discussion of commercial fishing in Washington and

18

off the California coast.[9]  By the end of the meeting, Shawkey said, their plan had been to have him find a sailboat he could turn into a fishing boat, and it also somehow included Catalina Island.  Shawkey disavowed any knowledge that Fred Vendrick had deposited $40,000 into his account, calling it simply "another mysterious deposit."

Shawkey also claimed to have no knowledge of San Clemente Island or any software development plans, and that he had not even thought about software since they had lost their software and computer company to a competitor several years earlier.  He claimed to know for a fact that Vendrick intended to flee the country, leave his wife, and disappear without a trace, and that Vendrick had told him as much personally.  He also denied having any knowledge of the formation of Vendrick's proposed LLC, or why it would be focused on software development.  Despite all this, Shawkey alleged he and Vendrick never had an argument of any kind.

Shawkey was then confronted by the investigators with several falsities he had planted in his voicemails, specifically about having charts prepared to travel to Mexico and about checking hotels in Avalon, neither of which were true.  They also pointed out that despite his professed concern for Vendrick and his disappearance in those voicemails, he never once actively searched for him, never made reference to his disappearance in any of his many interactions with others, and had spent the next three days largely idling about in Long Beach.  The only productive things Shawkey had done to that point were buy a replacement anchor for the one he had jettisoned in Two Harbors and a pirate flag for his boat, and despite his professed years of experience tracking fugitives as a bail bondsman, he had even forgotten to check with Vendrick's hotel to see if he had checked out.  Nonetheless, the investigators did not arrest Shawkey and released him to pursue whatever leads he could imagine.

---

[9]  Shawkey contradicts himself several times in the course of this interview.  Additionally, the claim the plan involved sailing stands in stark contrast with Shawkey's intransigence about learning to sail from *The Odyssey*'s previous owner.

Shawkey left Orange County and, as promised, travelled to Bike Week in Daytona, where he claimed to have been contacted by Vendrick through a mysterious bartender at a saloon. He called Investigator Hoffman to provide him with this update on March 5, 2008. This provided a new explanation for Shawkey to use regarding the insulin left in the hotel room, that Vendrick had a far more severe and imminently fatal condition that had caused him to want to flee from all his friends and family and live a life on the run. After finally acknowledging the existence of the river anchor that investigators had learned about, Shawkey then made another complaint about the held-up $100,000 in his account, arguing that it "was not [Vendrick's] money. [Vendrick] gave that to me. [¶] . . . [¶] He wired that money to me."

On May 8, Shawkey again phoned the OCSD to inform investigators he knew for a fact they did not have any leads, because Vendrick was actually in Mexico. He claimed he had spoken to Vendrick in person in Mexico after walking across the border in Brownsville, Texas. He used this fact to also explain how it was that Vendrick had arrived in Mexico despite leaving his passport at home in Phoenix when he left for Orange County in February. He elaborated that Vendrick had developed dementia, and that he did not want to be contacted or called by the police, and that everyone would be better off if they just dropped the case.

Shawkey had apparently found Vendrick through the same mysterious contact he used in Florida. He alleged Vendrick was travelling under the alias "Mike Vendrick" and staying at the Hotel Victoria in Matamoros, Mexico. Shawkey also alleged he had a note in Vendrick's handwriting to prove he was alive. Supposedly, Slama had dropped off Vendrick at the border with his duffel bag full of money, and the note had been delivered to Shawkey through a secret Mexican contact on an island off the Texas coast. Shawkey would later contradict this story by saying the contact was the same bartender he had met in Daytona. Investigators would also later confirm that

20

nobody named Robert, Mike, or Vendrick had stayed at the Hotel Victoria on the dates Shawkey gave them.

Shawkey would continue the charade of tailing Vendrick across Mexico, trying to lure him onto buses bound for San Diego to turn him in at the border, meeting with secret contacts whose identity and descriptions would change with each call to investigators, and hitch-hiking across Mexico and the American Southwest. None of Shawkey's claims about Vendrick's life in Mexico or his efforts to track him down would ever bear fruit. The handwritten note he recovered underwent extensive handwriting analysis and was determined not to be penned by Vendrick.

On May 16, 2008, Shawkey came back to Orange County for another interview. There he detailed many of his travels around Mexico supposedly looking for Vendrick, and mentioned Vendrick had left a phone for him in Daytona that Vendrick had used to call him. This flew in the face of all plausibility of the secret contacts and third party communications Shawkey had to this point told investigators about. Shawkey also went back into his history with Vendrick, claiming that in all his communications with him, money had always been a non-issue for Vendrick. Shawkey also claimed that Vendrick was going to give him $150,000 to "sell the computer program," despite having repeatedly denied any knowledge of any software or sales thereof to that point.

Confronted with his many inconsistencies, Shawkey admitted his story seemed farfetched. When investigators asked him what "12 licensed drivers" would likely make of all of his claims, Shawkey said they would probably conclude he killed Vendrick.

Shawkey would later claim in a March phone call to authorities that he had dumped the river anchor in the Dana Point Harbor once he realized it was useless, specifying it was attached to 20-30 feet of old white rope. Based on this claim, a highly trained dive team searched five locations around Dana Point Harbor, effectively covering the entire area the anchor could have reasonably been. The team was equipped with

21

active sonar technology capable of mapping the ocean floor to a high degree of accuracy in nearly any water condition, and in each case the team recovered a smaller double-blind test anchor hidden by their dive master. However, they never found the river anchor Shawkey allegedly discarded.

Despite a massive international missing-persons investigation that involved local police, federal agents and Interpol, authorities never found any sign of Vendrick either. In February 2009, roughly one year after Vendrick went missing, Shawkey was arrested on unrelated charges in Virginia. He was then extradited to California and charged with special circumstances murder for financial gain and grand theft. The prosecution also alleged the value of the taking exceeded $200,000. Trial was by jury. It spanned several weeks, but it took the jury less than three hours to find Shawkey guilty as charged.

I

Shawkey contends there is insufficient evidence to support the jury's finding he killed Vendrick. While he admits the evidence suggests he's a "liar and a thief," he insists he's "not a murderer." Having thoroughly examined the voluminous record in this case — and having set it forth at great length above because it is a "no body murder case" based entirely on circumstantial evidence — we find substantial evidence to support the jury's verdict.

In reviewing the sufficiency of the evidence to support a criminal conviction, we review the entire record "'to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Stuedemann* (2007) 156 Cal.App.4th 1, 5.) In so doing, we presume "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same

22

standard applies when, as here, the defendant's conviction rests primarily on circumstantial evidence.  (*Ibid*.)

Shawkey argues no rational trier of fact could have rejected his claim to investigators that, rather than killing Vendrick at sea on his way to Catalina Island, he returned Vendrick to the dock at Dana Point between 8:00 and 10:00 on the morning in question.  However, Shawkey did not come off as a pillar of veracity in speaking with authorities.  In fact, his assertions were thoroughly discredited by investigators, and every time he claimed Vendrick was alive while he was gallivanting about in Florida and Mexico, it was shown that not only was he incorrect about Vendrick's whereabouts, he was actively, and incompetently, lying.  We are not at liberty to second-guess the jury's determination Shawkey was not telling the truth when expressing his innocence to authorities.  (*People v. McDaniels* (1980) 107 Cal.App.3d 898, 903.)

Shawkey claims his story about returning Vendrick to Dana Point is equally plausible with the prosecution's murder theory, therefore necessitating reversal.  (See *People v. Blakeslee* (1969) 2 Cal.App.3d 831 [overturning murder conviction against the victim's daughter because there was an almost equally strong case to be made against the victim's son].)  But that is clearly not the case.  To accept Shawkey's story, the jury would have had to adopt an entirely unreasonable interpretation of the facts.

To wit, after getting dropped off at the dock, Vendrick, who had no luggage or passport, is not noticed by anyone.  The first thing he does is disable his cell phone before Shawkey can call and leave his first voicemail.  Then he gets rid of all of his credit cards, personal checks, and anything else that could personally identify him, except the cash in his wallet and the clothes on his back.  The first stage in his plan complete, he now makes good his escape from his wife, his girlfriend, his only brother, his children and grandchildren, and his personal finances, tattered though they may be in their post-Shawkey state.

23

After that, Vendrick sneaks around every security camera and witness in Dana Point, abandoning his rental car, *insulin supply*, and other personal effects in his hotel room.  He then travels, presumably on foot, to Mexico, where he takes on the name Mike and decides to spend his golden years using every cheap espionage-thriller trope he can think of to lead Shawkey on a merry chase across the North American continent, never to be heard from again.

While it is a time-honored tradition among the worst sorts of people, Shawkey's story redefines the concept of blaming the victim.  Vendrick did not simply fail to call and check in after getting off a flight.  He did not merely arrive home late from work by a few hours, or a few days, or even a few months.  He vanished from the face of the earth, now for over five years.  Vendrick, a then 71-year-old retiree, spent the majority of his time using the Internet, the most sophisticated tool for communication in history, and while doing so always left an enormous online footprint in the form of mailing list subscriptions and such.  Yet, no trace of his activities has been found online. That he could disappear so suddenly, utterly, and without any iota of preparation to do so allows only one tragic and inescapable conclusion.

His body was never found, so he did not simply fall off the dock in Dana Point, especially considering how thoroughly and repeatedly it was searched for him.  He was not seen by any eyewitnesses, while over the next several days a myriad of people remembered even the briefest of encounters with Shawkey and called investigators to say so.  Vendrick had no access to his finances, meager though they were at that point, and no resources on which to survive had he simply walked away.  As interconnected and heavily-surveilled as our world is, it would take tremendous effort to disappear in such a manner, even if Vendrick had reason to do so.  The only reasonable conclusion is that he died between Dana Point and Avalon.

And this is without reference to Shawkey's own phantasmagoric reports. Once one accounts for almost a year's worth of blundering by one of the world's most

incapable liars, his innocence becomes inconceivable. He lies compulsively and inconsistently. He repeatedly urges that he should not only be found innocent, but that he deserves the last $100,000 that his former friend was able to scrape together as some grisly reward for getting away with it. Shawkey is a large man, and Vendrick was not. There are any number of ways to murder at sea without leaving blood on the deck of one's ship, at least one of which involves a river anchor.

Shawkey not only lost a river anchor while at sea, he conveniently failed to mention this to the police when they initially questioned him. He left 13 voicemails for a man he had not seen in two days, then abandoned this pitiful token of concern to get drunk in Long Beach and buy a pirate flag. All things considered, the jury could only reasonably construe Shawkey's voicemails as a thinly veiled attempt to create an alibi for killing the very person to whom he pretended to be speaking.

Then there is the matter of Vendrick's dismal financial situation, to which Shawkey himself greatly contributed. At the time of his disappearance, Vendrick no longer had any disposable money Shawkey could extract from him, and in fact, he was trying his best to recover the small fortune Shawkey had swindled from him over the years. Not only had Vendrick outlived his usefulness to Shawkey, he was actually becoming a nuisance and threatening Shawkey's ever-perilous financial condition. Thus, Shawkey had a considerable motive to get rid of him.

Considering all the circumstances attendant to Vendrick's disappearance, the conclusion that Shawkey murdered him at sea for financial gain is virtually inescapable. Not only is the evidence of Shawkey's guilt substantial, it is positively overwhelming. We therefore reject his challenge to the sufficiency of the evidence.

## II

Shawkey's other argument is that the trial court erred in admitting certain hearsay statements into evidence. This claim also fails.

The statements in question were made by Shawkey to Vendrick during their meeting in Phoenix on February 9, 2008, a week before Vendrick went missing. Over defense counsel's objection, several witnesses were allowed to testify that, during the meeting, Shawkey told Vendrick he had acquired a lucrative contract with the federal government that necessitated Vendrick travelling to San Clemente Island.

As Shawkey admits, the statements he made to Vendrick constituted party admissions. Thus, had Vendrick been around to testify about the statements, they clearly would have been admissible. (Evid. Code, § 1220.) The problem, as Shawkey sees it, is that the statements came in through third parties who learned of Shawkey's statements from Vendrick. In Shawkey's view, this created a second layer of hearsay — Vendrick to the witnesses — that rendered the statements inadmissible.

However, the statements from Vendrick to the witnesses about what Shawkey had told him were not hearsay because they were not admitted for their truth, i.e., to prove there was a federal contract Vendrick had to attend to in California. Rather, the statements were admitted to show Vendrick's state of mind and to explain his actions after hearing them. (Evid. Code, § 1252 [statements admitted for these purposes are not made inadmissible by the hearsay rule].) Particularly, they were relevant to explain what motivated Vendrick to come to California and to show what he did once he got there.

Recognizing the statements were admissible for this limited purpose, the trial court instructed the jurors as follows: "During the trial, certain evidence was admitted for a limited purpose. Witnesses Carole Vendrick, Sharlene Slama, Fred Vendrick, and Leo Pruett testified that Robert Vendrick told them about statements allegedly made to him by the defendant Gary Shawkey. You are not to consider those statements for the truth of the matter asserted in those statements, rather you may consider the statements to evaluate Robert Vendrick's state of mind and the effect, if any, that the alleged statements had on Robert Vendrick's actions. You may consider that evidence only for the limited purpose and for no other."

26

Shawkey argues the court should have worded this instruction differently, and instead of tailoring it to the statements he told Vendrick, it should have referenced the statements Vendrick told the witnesses. But the context of the instructions makes clear the statements Vendrick told the witnesses were the same statements Shawkey told him. So, by telling the jury not to consider those statements for their substantive truth, the jury avoided the hearsay problem that Shawkey complains of. It is simply not reasonably probable the jury misused the subject evidence or that its admission rendered Shawkey's trial unfair. Therefore, there is no cause for reversal.

DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

IKOLA, J.

27