Filed 11/4/24  P. v. Beverson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D082820 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN425941) |
| DANIEL JHERAN BEVERSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Kristen Kinnaird Chenelia, Deputy Attorneys General for Plaintiff and Respondent.

Following trial, a jury found Appellant Daniel Jheran Beverson guilty of the second degree murder of Shannon Betz. (Pen. Code,[1] § 187, subd. (a).) On appeal, Beverson contends there was insufficient evidence to support his conviction. We disagree. Therefore, we affirm the conviction.

FACTUAL AND PROCEDURAL BACKGROUND

The People charged Beverson with the murder of Betz (§ 187, subd. (a)), as well as allegations of the personal discharge of a firearm causing death (§ 12022.53, subd. (d)) and intentional killing by means of lying in wait (§ 190.2, subd. (a)(15)). Jury trial began in May 2023. The relevant evidence provided at trial is as follows.

At the time of his murder on or around August 7, 2021, Betz owned a condominium in Vista, where he lived with his roommate and friend, Kathleen Paige. Betz and Paige were roommates for 15 years, and she knew him very well. At trial, Paige testified as to certain of Betz's habits and routines. He always kept his wallet in a basket in the kitchen. Betz was "always on his phone" and ordinarily very good about promptly responding to communications. Betz owned a new car, which he kept in the garage of his home next to Paige's car, with the garage door closed. The garage provided closer access to guest parking than the front door of the home, so when people came to their home, Betz and Paige usually brought them in through the garage. According to a neighbor, on weekends, Betz routinely opened two green umbrellas on his patio in the morning and closed them in the evening.

Betz was gay, used multiple gay dating applications, and frequently invited young men he met online to the home. One application Betz used was Grindr, which connects gay individuals located near one another.

---

[1]    Undesignated references are to the Penal Code.

2

On August 6, 2021, Betz sent a message on Grindr to multiple individuals that read: "Looking for overnight fun for 1K if interested." One of those individuals was Beverson, who used a username "Masc" with a googly eyes emoji and a peach emoji—which stands for a masculine male looking for bottoms—and referred to himself as Jay. Beverson responded that he was interested, and the two messaged back and forth in the application, discussing arrangements to meet. Beverson also sent photographs of himself to Betz. However, Beverson eventually stopped responding to Betz's messages that night.

The following morning, August 7, 2021, Betz restarted the conversation on Grindr at 10:26 a.m., and Beverson responded. Betz offered to pay Beverson $500 to "chill now for a couple hours"; he also made that offer to other individuals on the application. Beverson agreed to Betz's offer at 10:32 a.m. but said he needed a half an hour. Beverson sent a text message to his sister at 10:59 a.m. that he was "[a]bout to run to the bank." However, he did not make any deposits into or withdrawals from his bank account on that day.

At 11:06 a.m., Beverson messaged Betz that he was ready to leave his house, and Betz provided his address. Then, at 11:12 a.m., Betz wrote, "Let me know when here. Place is a bit hard to find."

Data from Beverson's phone showed that he searched Betz's address in Apple Maps at 11:08 a.m. At 11:09 a.m., Beverson messaged that he would arrive in 15 minutes. Video footage from a nearby gas station showed his car driving in the direction of Betz's home at around 11:14 a.m. According to phone data, Beverson was located at Betz's home beginning around 11:19 a.m.

3

Indeed, Beverson messaged at 11:18 a.m. on Grindr that he had arrived, and he discussed with Betz the location of the house and where Beverson could park his car. Betz's final messages were "I'll come out," at 11:23 a.m., and "Where did you park?" at 11:24 a.m.

Meanwhile, at Betz's home, the Ring camera showed him exiting his front door at around 11:11 a.m. He opened his two green umbrellas, and he said into his phone, "Let me know when here," appearing to use a talk to text feature. That statement corresponded exactly in time to the 11:12 a.m. message he sent to Beverson on Grindr. As Betz spoke, he returned inside. Betz's garage door was opened by the wall unit at 11:20 a.m. and subsequently closed at 11:25 a.m. The garage door was then opened at 11:36 a.m.

At around 11:39 a.m., Beverson uninstalled the Grindr app. Also around that time, footage from the gas station showed him driving at a high speed away from Betz's home. His phone data showed that he had returned to his home by 11:48 a.m. At 11:58 a.m., Beverson posted to his Twitter account, "Times are hard and this ain't the time to get soft."

Betz's neighbor noticed Beverson's garage door remained open throughout the day on August 7, starting from around 10:30 or 10:45 a.m., which was out of the ordinary. The garage door remained open at around 9:30 a.m. and 2:00 p.m. the next day, Sunday, August, 8, 2021. Late at night on August 7, Betz's neighbor sent him a text message about the open garage door. Betz never responded to that message, or to two messages sent by the neighbor the following morning, which was also unusual. Additionally, the neighbor rang Betz's doorbell the afternoon of August 8, with no answer. Further, the neighbor was 90 percent sure Betz's green umbrella remained open all night, which was unusual.

4

On August 8, 2021, Betz was supposed to pick up Paige from LAX Airport. When he did not respond to her messages informing him of her arrival, Paige rented a car and drove home. She arrived just after 9:00 p.m., and the garage door was open with her and Betz's cars inside. Paige went inside and discovered Betz's dead body in his bedroom. She also noticed that Betz's wallet was not in the basket in the kitchen where he usually kept it. Nothing else appeared to be missing from the home, and there was no sign of a break in through the windows or doors. Paige called 911, and police arrived on the scene shortly thereafter.

Betz's body was discovered naked, face down on the bed with his legs straight, the balls of his feet on the floor, and his arms above his head, with blood on and around his head. When police arrived, his body appeared stiff, with rigor set in and with discoloration on his legs and feet. Police did not uncover a gun but observed a bullet cartridge case on the floor. The cartridge case appeared to eject out of a 9-millimeter semiautomatic handgun.

The subsequent investigation by law enforcement uncovered no signs of life from Betz after his 11:24 a.m. message to Beverson. The garage door remained open after 11:36 a.m. On August 7, Betz's phone received text messages at 12:07 p.m., 12:21 p.m., 1:02 p.m., 1:27 p.m., 4:33 p.m., 7:33 p.m., and 9:13 p.m., which remained unread and received no responses from Betz. That evening, Betz's phone recorded a missed call at 9:22 p.m.; the following day, Betz received calls at 10:39 a.m., 12:51 p.m., 1:08 p.m., 5:41 p.m., 6:13 p.m., and 6:14 p.m., which went unanswered.

Medical examiners confirmed that Betz died of a gunshot wound to the back of the head shot from close range. On Betz's right hip, there was DNA from two contributors, with a low level of support for the conclusion that

5

Beverson was the second contributor in addition to Betz. There was no evidence on Betz's body of foreign DNA from sexual activity.

Although police did not find a gun in Beverson's bedroom, they found a firearm safety certificate, a prerequisite to purchasing a gun in the state of California. They also discovered a box from a company that sells guns manufactured to 80 percent completeness; the box was empty except for a piece of cellophane and the gun's literature. The remainder of the gun parts can be purchased and the gun completed. At that point, the owner should obtain a serial number, but many do not, resulting in an "unserialized weapon," or "ghost gun." The box discovered under Beverson's bed came with parts designed to be manufactured into either a 9-millimeter or 40-caliber weapon.

Also in Beverson's bedroom, police discovered a pair of distinctive boxer briefs, a white metal bracelet, and a gold color necklace that matched the photos sent to Betz on Grindr. Police recovered from Beverson's phone the photos he had sent to Betz on Grindr. Further, police found Beverson's work name tag, which read "Jay," as he had referred to himself to Betz on Grindr.

After the close of evidence at trial, the defense moved to dismiss the case under section 1118.1 based on the absence of substantial evidence to establish each element of the offense charged. The court denied the motion, concluding the People had met their burden under that section, and it is the province of the jury to weigh the circumstantial DNA evidence, cell phone evidence, social media evidence, video evidence, and witness testimony evidence presented by the People.

The jury found Beverson guilty of second degree murder and found true the allegation that he personally used a firearm causing death. He was sentenced to 15 years to life in prison.

6

DISCUSSION

On appeal, Beverson contends there was insufficient evidence to establish that he murdered Betz. We conclude, viewing the evidence in the light most favorable to the judgment, the solid, credible evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Beverson murdered Betz.

Due process guaranteed by the Fourteenth Amendment requires sufficient evidence " 'to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 198, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 316 (*Jackson*).) The " 'inquiry does not require a [reviewing] court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " (*Mumin*, at p. 198, citing *Jackson*, at pp. 318–319.) Rather, "an appellate court retrospectively inquires whether a rational trier of fact *could have* found the defendant guilty beyond a reasonable doubt, based on all the evidence when viewed in the light most favorable to the prosecution." (*Mumin*, at p. 199.)

Thus, " '[w]hen reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] 'A reviewing court neither reweighs the

7

evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378 (*Thomas*).)

This standard applies equally when the evidence is circumstantial. (*People v. Hardy* (2018) 5 Cal.5th 56, 89.) In other words, a jury must " 'acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence,' " but the appellate court need not "be convinced of the defendant's guilt beyond a reasonable doubt," as long as " ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139 (*Catlin*).)

"The elements of second degree murder are: (1) an unlawful killing; (2) accomplished with malice aforethought, whether express or implied." (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735.) "Circumstantial evidence may constitute substantial evidence of guilt" of murder, even in the absence of direct evidence. (*Catlin, supra*, 26 Cal.4th 81 at p. 142.)

According to Beverson, "the circumstantial evidence proved only that appellant spent 10 minutes at Betz's house the day before Betz was found dead," and the conclusion that Beverson murdered Betz based on that evidence was speculative. This description, however, is a woefully incomplete summary of the evidence produced at trial. The evidence supporting the jury's guilty verdict and reasonable inferences thereon include: in communications over the Grindr application, Betz agreed to pay Beverson $500 in exchange for sexual activity on August 7, 2021, and he had offered Beverson $1,000 the previous evening; immediately prior to leaving for Betz's home, Beverson told his sister he was on the way to the bank but did not

8

deposit into or withdraw funds from his account that day; Beverson left his home for Betz's home at 11:09 a.m. and arrived in the complex at 11:18 a.m.; Betz met with Beverson around 11:24 a.m., after which Betz's garage door was closed; Betz was shot in the back of the head at close range while naked and facing his bed; Beverson and Betz did not engage in the sexual activity they had agreed upon; Betz's garage door was opened at 11:36 a.m.; Beverson uninstalled the Grindr application at 11:39 a.m.; Beverson drove at a high rate of speed away from Betz's home at around 11:39 a.m.; Beverson returned home by around 11:48 a.m.; Beverson wrote a post on Twitter at 11:58 a.m. that read: "Times are hard and this ain't the time to get soft"; after 11:36 a.m. on the day he met Beverson, around the time Beverson left Betz's home, Betz's garage door remained open until his roommate returned the following evening, despite his usual practice to keep the garage door closed; starting around 30 minutes after his garage door was opened, Betz received multiple text messages, none of which he read or answered, despite usually being very responsive; Betz received phone calls after his meeting with Beverson, which likewise went unanswered; Betz's wallet was missing from his home when Paige returned; Beverson had an empty box of a partially manufactured gun in his bedroom which was capable of being manufactured into a 9-millimeter handgun; and the bullet casing in Beverson's bedroom was from a 9-millimeter handgun.

In sum, Beverson knew Betz had a large amount of cash, met with Betz, did not engage in sexual activity with Betz as agreed, did not remain at Betz's home for long, took actions consistent with consciousness of guilt immediately after leaving Betz's home, and possessed an empty box for a partially manufactured gun that is often made into a ghost gun. Meanwhile, Betz ceased all usual activity immediately after Beverson left the home, and

9

Betz's body was found in the state that would be expected for the sexual activity he discussed with Beverson but that never occurred. We conclude this evidence suffices for a rational trier of fact to conclude beyond a reasonable doubt that Beverson intentionally killed Betz with malice aforethought.

Contrary to Beverson's argument, we see no "missing link" in this chain of circumstantial evidence. (*People v. Redrick* (1961) 55 Cal.2d 282, 290.) Beverson suggests that the missing link is, in essence, direct evidence— eyewitnesses to the murder, forensic evidence, and a murder weapon. It is well established, however, that the prosecution can build a case based wholly on circumstantial evidence, thus the mere absence of direct evidence cannot in itself establish a "missing link." Beverson raises additional "missing links," including "there were . . . no eyewitnesses who saw appellant at Betz's condo at any time, [there were] no reports of anyone hearing gunshots from Betz's condo at any point, . . . [and] there was no alleged motive." The circumstantial evidence introduced covered each of these points: phone data and messages established Beverson's presence at Betz's home, Betz was shot in his home, and Beverson knew Betz had a large amount of cash, faced hard times, and said he was going to the bank. It was the province of the jury to weigh this evidence; we must view it most favorably to the respondent.

Next, Beverson contends "there was compelling evidence tending to suggest someone other than appellant could have killed Betz." However, this argument demands that we undertake impermissible actions as a reviewing court. We may not reweigh evidence or the credibility of witnesses. Nor may we reverse even if we believed " ' " ' "the circumstances might also be reasonably reconciled with a contrary finding." ' " ' " (*Thomas, supra*, 14 Cal.5th at pp. 377–378; see also (*Mumin, supra*, 15 Cal.5th at p. 198

10

[" 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge [in a court trial] or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Ultimately, it is within the [fact-finder's] exclusive province to determine whether an inference that may be drawn from the evidence is, in fact, the only reasonable one, a determination that depends on its resolution of conflicting evidence and weighing the credibility of witnesses"].) Permitting the reviewing court to "draw its own inferences and compare them to other possible inferences . . . . would have the court resolve conflicts in the evidence and weigh the testimony of witnesses," which " 'would be a clear usurpation of the jury's exclusive function.' " (*Mumim*, at p. 202.)

The United States Supreme Court has rejected the "theory that the prosecution [is] under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." (*Jackson, supra*, 443 U.S. at p. 326.) Thus, the People need not have proved that every other individual Betz messaged and every prior boyfriend did not murder him. Here, the jury believed the circumstances demonstrated beyond a reasonable doubt that Beverson murdered Betz, and our only function is to determine whether sufficient evidence supported that conclusion. We have determined it does.

Finally, Beverson relies on the case *People v. Blakeslee* (1969) 2 Cal.App.3d 831, 838 (*Blakeslee*), asserting the circumstantial evidence in this case was even less substantial than the overturned conviction there. We disagree. In *Blakeslee*, the defendant lived with her mother and brother; the evidence that the defendant had killed her mother was that she was present at the scene of the crime just before and just after her mother's murder, she had previously quarreled with her mother, and she lied to police about her

11

actions on the night of the murder and about her knowledge of her brother's rifle. (*Id.* at pp. 838–839.) The court concluded this evidence was not sufficient for a trier of fact to reasonably conclude beyond a reasonable doubt that defendant had murdered her mother. (*Id.* at p. 839.)

*Blakeslee* is "readily distinguishable" to the case here, as in the case *People v. Snow* (2003) 30 Cal.4th 43, 68. As described by the Supreme Court in *Snow*, the same set of circumstances applied to the defendant in *Blakeslee* and her brother: they both lived with their mother, they both quarreled with their mother, they both had access to the same rifle owned by brother, and the defendant's same lies to police could have been to protect either herself or her brother. (*Snow,* at p. 68.) Here, a "virtually unique" (*ibid.*) set of circumstances provided evidence implicating Beverson, including the meeting between him and Betz that occurred immediately prior to Betz showing no signs of life, Beverson's deleting the Grindr application and sending an ominous tweet shortly after his meeting with Betz, and Beverson's possession of an empty partially manufactured gun box. This evidence did not apply to any other individual. Moreover, the record contains no evidence that any of these other individuals were present when Betz showed signs of life, unlike in *Blakeslee*, *supra,* 2 Cal.App.3d 831, where it was undisputed that defendant and her brother were present the night of and around the time of the murder.

Further, only if there is no hypothesis for which substantial evidence supports the conviction may we reverse. A hypothesis for Beverson's conviction supported by substantial evidence exists in this case, which the jury found true beyond a reasonable doubt. Even if we believed " ' " ' "the circumstances might also be reasonably reconciled with a contrary finding," ' " ' " we may not reverse the judgment. (*Thomas, supra*, 14 Cal.5th at p. 377–378.)

12

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


CASTILLO, J.